SUPREME COURT OF ARIZONA
En Banc

STATE OF ARIZONA,                 ) Arizona Supreme Court
                                  ) No.  CR-02-0044-AP
                    Appellee,     )
                                  ) Pima County
              v.                  ) Superior Court
                                  ) No.  CR-43804
ROBERT JOE MOODY,                 )
                                  ) **O P I N I O N**
                    Appellant.    )
_____)

Appeal from the Superior Court in Pima County
The Honorable Michael J. Cruikshank, Judge

**CONVICTIONS AFFIRMED;**
**SENTENCE VACATED AND REMANDED**

_____

JANET A. NAPOLITANO, FORMER ARIZONA ATTORNEY GENERAL      Phoenix
TERRY GODDARD, ARIZONA ATTORNEY GENERAL
      by   Kent E. Cattani, Chief Counsel,
           Capital Litigation Section
      and  Donna J. Lam, Assistant Attorney General      Tucson
Attorneys for State of Arizona, Appellee

SUSAN A. KETTLEWELL, PIMA COUNTY PUBLIC
DEFENDER'S OFFICE                                         Tucson
      by   Frank P. Leto, Deputy Public Defender
      and  Brian X. Metcalf, Deputy Public Defender
Attorneys for Robert Joe Moody, Appellant

_____

**B E R C H**, Justice

¶1        In 2001, Appellant Robert Joe Moody was convicted of two counts of first degree murder for the deaths of Michelle Malone and Patricia Magda.  The trial judge sentenced him to death pursuant to Arizona Revised Statutes ("A.R.S.") § 13-703

(Supp. 1993).  An automatic Notice of Appeal was filed pursuant to Rule 31.2(b) of the Arizona Rules of Criminal Procedure. This court has jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 13-4031 (2001).

## I. FACTS[1]

¶2    On November 15, 1993, Robert Moody drove to the home of his ex-girlfriend's friend, Michelle Malone.  After ascertaining that Malone was alone, Moody knocked on the door. Malone answered and let him in.

¶3    Moody followed Malone into the kitchen.  There, he pulled a kitchen knife from his coat pocket and attacked her. Malone tried to defend herself, cutting her hand in the process. Moody held Malone by the neck and forced her into her home office, where he emptied her purse and took cash, a checkbook, and some credit cards.  He ordered Malone to write a check for $500.  Because that check was smeared with blood, he made her

---

[1]    On appeal, this court views the facts presented in the trial court "in the light most favorable to sustaining the verdict." *State v. Dann*, 205 Ariz. 557, 562 n.1, 74 P.3d 231, 236 n.1 (2003) (*citing State v. Gallegos*, 178 Ariz. 1, 9, 870 P.2d 1097, 1105 (1994)).  Many of the facts are reprinted from the court's earlier decision in this case, which is reported at *State v. Moody*, 192 Ariz. 505, 506, ¶¶ 2-6, 968 P.2d 578, 579 (1998).  We reproduce the facts in substantial part because they are necessary to the disposition of some of the issues raised in this appeal, adding others as necessary for a complete understanding of new issues raised.

write another.

¶4      He then forced Malone back to the kitchen and tied her to a chair with some telephone cords that he had ripped from the wall.  He dragged her – still tied to the chair – into a bedroom, where he found a .22 caliber rifle and a Winchester 12-gauge shotgun in a closet.  He hit Malone over her head with a BB gun, then shot her several times with the .22 caliber rifle, re-loading between each shot.  After shooting Malone, Moody found a Ruger .22 caliber pistol in a chest of drawers and placed the pistol in his pocket.  He then wrapped the rifle and shotgun in a blanket and drove home and went to sleep.

¶5      Five days later, Moody went next door to Patricia Magda's home.  After they talked for a while and smoked a few cigarettes, Moody followed Magda down a hallway to see a Christmas calendar she had made.  Moody pushed her to the floor, then bound her wrists and ankles with neckties he had brought with him.  In the kitchen, he found Magda's purse, from which he took cash and credit cards.  After yanking the phone cords from the wall, Moody returned to Magda and demanded the personal identification number ("PIN") for her bank card.  After she gave him a number, he tied her up, covered her with a rug and weighed her down by putting a chair on her.

¶6      Moody drove Magda's car to a Bank of America and tried

to withdraw money using her bank card. When he was unable to get any money, he returned to Magda's home and again demanded her PIN number. He went back to the bank and withdrew $300. He then returned to Magda's home, slit her throat, stabbed her in the back, and bludgeoned her to death with hedge clippers. He removed the neckties he had used to bind her, wrapped them in a towel in the kitchen, and left the house. He put his luggage into Magda's car and drove away.

¶7    About a month later, on December 20, 1993, Moody broke and climbed through a kitchen window into the Yuma, Arizona home of Mary DeForest, his ex-wife's sister. After demanding cash and guns, Moody tied DeForest up, ordered her and her two sons into a closet, and nailed the door shut. He took DeForest's purse and left in her Suburban, leaving Magda's car behind.

¶8    After leaving DeForest's house, Moody drove to Las Vegas before eventually proceeding to California. At approximately 3:00 a.m. on January 4, 1994, Moody flagged down San Bernadino County Deputy Joseph Duarte in Baker, California. Moody identified himself to Deputy Duarte as "Todd Joe Williams" and claimed that his car had been stolen about three hours earlier by a black male hitchhiker he had picked up outside of Las Vegas. When asked for specific information about the vehicle, Moody could say only that it was a blue and gray

- 4 -

Suburban. He was unable to give the officer a vehicle identification number, license plate number, or any other information. Deputy Duarte took Moody to the Sheriff's Office for further questioning. When Moody was unable to provide any further information regarding the vehicle, he was released.

¶9 Between 4:00 and 4:30 p.m. that same day, Moody appeared at a rescue mission in Santa Ana, California. He told the mission's director, Reverend James Womack, that he had no idea who he was or where he was from, although he thought his name was Bob. Reverend Womack advised him to contact the police.

¶10 Approximately two hours later, a paroled felon named Carlos Logan was arrested outside the Los Angeles Airport for driving Mary DeForest's stolen Suburban.

¶11 The next morning, January 5, 1994, Moody went to the Orange County Sheriff's Department and told two uniformed police officers that he had amnesia and knew only that his first name was Bob. The officers fingerprinted him, leading to the discovery of warrants for the murders of Michelle Malone and Patricia Magda. The officers arrested Moody and told him that he had killed two people. Looking confused, Moody replied, "I did?" Later that day, Tucson Police Department Detective Karen Wright and Pima County Sheriff's Department Detectives Michael

Ying and Bryce Tipling flew to California to interview Moody on videotape before transporting him to Tucson. Throughout the interview, Moody maintained that he woke up on a bench on January 4th, did not know how he got there or who he was, and had no memory of events before 12:30 p.m. of that day. Moody was then returned to Arizona to stand trial for the murders of Michelle Malone and Patricia Magda.

## II. PROCEDURAL HISTORY

¶12     On February 1, 1994, the State presented evidence of the murders of Michelle Malone and Patricia Magda to a grand jury. At that hearing, Tucson Police Detective Karen Wright testified that Carlos Logan, the paroled felon who was arrested for driving Mary DeForest's Suburban, had informed detectives that he had traded cocaine for the car with the vehicle's owner, a white male named "Bob," who had bragged at the time about killing two people in Tucson and being profiled on "America's Most Wanted." The grand jury indicted Moody for the two murders.

¶13     Pima County Public Defender Daniel Grills was appointed to represent Moody. On June 21, 1995, at Moody's demand, Grills filed a motion to withdraw as counsel. Moody later filed a motion waiving his right to counsel and asserting his right to represent himself. On July 13, 1995, the court had

a hearing on the motions at which Moody testified to his desire to represent himself. The court found his waiver of counsel knowing, intelligent, and voluntary. The case proceeded to trial and Moody defended himself solely on the ground that his participation in the crimes was involuntary because aliens took control of his body and made him kill Michelle Malone and Patricia Magda, rendering Moody a mere unconscious observer of the murders. He was convicted on both counts and was sentenced to death after an aggravation and mitigation hearing.

¶14 On appeal, this court found that Moody was denied his right to counsel and reversed his convictions and remanded the case for a new trial. *State v. Moody*, 192 Ariz. 505, 509, ¶ 24, 968 P.2d 578, 582 (1998). Moody was retried in May 2001. For the retrial, John Seamon was appointed to represent Moody. He filed several motions to determine Moody's competency. After a hearing on the eve of trial, the court found no reason to question Moody's competency to stand trial, confirming earlier rulings to the same effect. Moody immediately announced that he would not attend his trial because it was "illegal."

¶15 Jury selection in Moody's second trial began the next day. After a fifteen-day trial, the jury again convicted Moody of both murders.

¶16 Following an aggravation/mitigation hearing, the trial

judge found the multiple conviction, pecuniary gain, and especially cruel, heinous or depraved aggravating factors applicable to both murders.  The court found that the defense failed to prove any statutory mitigating factors, but did prove four non-statutory mitigating factors:  lack of prior criminal history, good employment history, military service, and non-violent character.  But weighing the mitigating factors against the three aggravating factors, the court concluded that they were insufficient to call for leniency and imposed a sentence of death for each homicide.

## III.  TRIAL ISSUES

### A.  Double Jeopardy Bar of the Second Trial

¶17      Moody argues that the second trial should have been barred by the Double Jeopardy Clauses of the United States and Arizona Constitutions.  *See* U.S. Const. amend. V; Ariz. Const. art. 2, § 10.  He makes two separate double jeopardy arguments.  First, he argues that double jeopardy should have barred retrial because the prosecutor committed egregious misconduct in the first trial.  Alternatively, he argues that the principles of double jeopardy should have prevented the State from improving its case at the second trial.

### 1.   Double Jeopardy Bar of Retrial

¶18      Whether double jeopardy bars retrial is a question of

law, which we review de novo. *State v. Siddle*, 202 Ariz. 512, 515, ¶ 7, 47 P.3d 1150, 1153 (App. 2002).

¶19 Two months before his second trial, Moody filed a motion to dismiss the case and preclude retrial because of prosecutorial misconduct occurring before and during his first trial. Moody claimed that the prosecutor committed misconduct in the first trial by providing false information to the mental health experts and intentionally interfering with his relationship with his attorney. Consequently, he argued, the principles of double jeopardy should have barred retrial. The motion was denied and the case proceeded to trial. Moody raises this claim again on appeal.

¶20 Traditionally, this court has extended double jeopardy protection based on prosecutorial misconduct only to cases in which the defendant moves for mistrial on those grounds. *See Pool v. Superior Court*, 139 Ariz. 98, 108-09, 677 P.2d 261, 271-72 (1984) (holding that "jeopardy attaches under art. 2, § 10 of the Arizona Constitution when a mistrial is granted" and other specified conditions are met); *see also State v. Jorgenson*, 198 Ariz. 390, 392, ¶ 7, 10 P.3d 1177, 1179 (2000) (extending *Pool* to cases in which the mistrial motion was meritorious and should have been granted). Moody filed no such motion in his first trial, and the convictions arising out of that trial were

reversed for deprivation of counsel, not prosecutorial misconduct. *Moody*, 192 Ariz. at 509, ¶ 23, 968 P.2d at 582. Thus, Moody relies on the only case in which double jeopardy protections have been applied in the absence of a motion for a mistrial: *State v. Minnitt*, 203 Ariz. 431, 55 P.3d 774 (2002).

¶21       In *Minnitt*, we held that double jeopardy barred the retrial of a defendant whose convictions were procured by false and perjured testimony that the prosecutor placed before the jury with full knowledge of its perjurious character and of the likelihood that it would support a conviction. *Id.* at 439-40, ¶¶ 37-45, 55 P.3d at 782-83. Our holding in that case was expressly conditioned on the prosecution's concealment of the misconduct; we reasoned that the misconduct in that case would have warranted a mistrial had it been discovered. *Id*. at 439, ¶ 35, 55 P.3d at 782 (holding that a mistrial is not a prerequisite for a double jeopardy claim if a prosecutor "engages in egregious conduct sufficient to require a mistrial but manages to conceal his conduct until after trial"). Moody does not claim that the misconduct of which he now complains — offering false evidence before the grand jury and interfering with his relationship with counsel — was concealed as was the conduct in *Minnitt*. Additionally, while Minnitt could point to places in the trial at which a mistrial would have been

- 10 -

appropriate had the misconduct been overt, Moody has made no such assertion regarding his first trial. In short, not only did Moody fail to move for a mistrial, but he has failed to demonstrate that a mistrial would ever have been appropriate. Consequently, our holding in *Minnitt* offers Moody no refuge from the requirement that a motion for a mistrial based on prosecutorial misconduct be made during trial to preserve the issue for appeal. This issue therefore is not properly before us.

¶22     *Minnitt* also differs in one other important respect: after the trial court denied his motion to dismiss on double jeopardy grounds, Minnitt filed a special action seeking review of that decision. *Id.* at 437, ¶ 24, 55 P.3d at 780. Our courts have held that "a petition for special action is the appropriate vehicle for a defendant to obtain judicial appellate review of an interlocutory double jeopardy claim." *Nalbandian v. Superior Court*, 163 Ariz. 126, 130, 786 P.2d 977, 981 (App. 1989). The reasons underlying the preference for special action review of denials of motions to dismiss based on double jeopardy are obvious: Because the Double Jeopardy Clause guarantees the right to be free from subsequent prosecution, the clause is violated by the mere commencement of retrial. *See Abney v. United States*, 431 U.S. 651, 660-61 (1977) (observing that

- 11 -

appellate review of a double jeopardy claim before retrial may prevent "personal strain, public embarrassment, and expense of a criminal trial" caused by a retrial eventually overturned on double jeopardy grounds).

¶23     This court has never reviewed a double jeopardy claim based on prosecutorial misconduct if the defendant had not previously moved for mistrial or sought relief by special action from the trial court's denial of his motion to dismiss on those grounds.  Moody provides no compelling reasons to diverge from this practice.

    2.  Improvement of the State's Case on Retrial

¶24     In addition to filing a pretrial motion to dismiss based on double jeopardy grounds, the defense also sought to preclude the State from offering any evidence on retrial that it had not offered at the first trial, claiming that double jeopardy principles prevented the State from improving its case on retrial.  At Moody's second trial, the State presented testimonial and physical evidence that it did not offer at the first trial.  Additionally, after relying solely on premeditation at the first trial, the State added felony murder theories as to both murders on retrial.  Moody now argues that the admission of this new evidence and the addition of the felony murder theories in the second trial violated his

constitutional protection against double jeopardy.

¶25        Moody relies on the United States Supreme Court's opinion in *Burks v. United States*, 437 U.S. 1, 11 (1978), for the proposition that the use of new evidence in a retrial violates both federal and state double jeopardy protections. His reading of *Burks* is flawed. *Burks* states that "[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." *Id.* Giving full effect to the phrase "for the purpose of" makes clear that *Burks* applies only to cases reversed for insufficiency of the evidence. *See id.* In such cases, the state cannot be allowed a second opportunity to prove a defendant guilty. *Id.*

¶26        In contrast, the Supreme Court has held that in all cases but those reversed on grounds of insufficient evidence, the Double Jeopardy Clause "imposes no limitations whatever upon the power to *retry* a defendant who has succeeded in getting his first conviction set aside." *North Carolina v. Pearce*, 395 U.S. 711, 719-20 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989). When a case is reversed for any reason but insufficient evidence, "the original conviction has been nullified and 'the slate wiped clean.'" *Bullington v. Missouri*, 451 U.S. 430, 442 (1981) (quoting *Pearce*, 395 U.S. at

721).  While neither case specifically addresses the presentation of additional evidence, it follows that if the slate is "wiped clean," the state is not limited to using evidence presented at the first trial.  *See Bullington*, 451 U.S. at 442; *Pearce*, 395 U.S. at 721; *see also Tibbs v. Florida*, 457 U.S. 31, 43 n.19 (1982) (recognizing that "[a] second chance for the defendant . . . inevitably affords the prosecutor a second try as well," and that "new evidence or advance understanding of the defendant's trial strategy will make the State's case even stronger during a second trial than it was at the first").

**¶27**    Moody's case, on the other hand, was reversed for deprivation of counsel.  The sufficiency of the evidence of guilt was not at issue.  *Moody*, 192 Ariz. at 509, ¶ 23, 968 P.2d at 582.  Consequently, we find no abuse of discretion in the court's refusal to restrict the State to evidence it offered in the first trial.

**¶28**    Finally, Moody contends that the State violated double jeopardy principles by adding a felony murder theory in the second trial after relying solely on a premeditated murder theory in the first trial.  Moody relies on *Thompson v. Calderon*, 120 F.3d 1045, 1055-59 (9th Cir. 1997) (en banc), *rev'd on other grounds*, 523 U.S. 538 (1998), in claiming that the use of fundamentally inconsistent theories at the two trials

violates a defendant's right to due process. Moody's reliance is misplaced, however, because *Thompson* involved a prosecutor who proceeded on conflicting theories in separate trials of co-defendants. *See id.* at 1055-57. That case turned on the prosecutor's actions of "manipulat[ing] evidence and witnesses, argu[ing] inconsistent motives, and at [the second defendant's trial], essentially ridicul[ing] the theory he had used to obtain a conviction and death sentence at Thompson's trial." *Id.* at 1057. Moody is only one person, and the theories offered are not necessarily inconsistent. Thus *Thompson* is inapposite.

¶29    Moody offers no other support for his argument that the State could not lawfully proceed on a felony murder theory in the second trial. Consequently, we conclude that the trial judge did not abuse his discretion in denying Moody's motions to preclude the State from proceeding on felony murder theories at the second trial.[2]

## B. Failure to Dismiss the Indictment

¶30    Moody argues that the trial court erred in failing to dismiss his indictment because it was based in part on evidence that the State knew or should have known was at least partly

---

[2]    Moreover, any prejudice to Moody is minimal because he was convicted of both premeditated murder and felony murder as to each victim at his second trial.

false.  At the grand jury hearing, Tucson Police Detective Karen Wright testified that after Carlos Logan was arrested for driving Mary DeForest's stolen Suburban, he told police officers that he received the vehicle in a trade for cocaine with a man named "Bob" who bragged about killing two people in Tucson. Moody claims that this evidence was false and requests that we reverse his convictions because false evidence was used to procure his indictment.

¶31      Because Moody did not seek relief by special action from the trial court's denial of his motion, our scope of review on direct appeal is limited.  Arizona case law is clear that, with one exception, all challenges to a grand jury's findings of probable cause must be made by motion followed by special action before trial; they are not reviewable on appeal.  *State v. Murray*, 184 Ariz. 9, 32, 906 P.2d 542, 565 (1995).  That one exception to the rule occurs "when a defendant has had to stand trial on an indictment which the government knew was based partially on perjured, material testimony."  *State v. Gortarez*, 141 Ariz. 254, 258, 686 P.2d 1224, 1228 (1984) (citing *United States v. Basurto*, 497 F.2d 781 (9th Cir. 1974)).  Thus, on appeal we will review the indictment only to determine whether

it was based on perjured, material testimony.[3]

¶32     In *Basurto*, the Ninth Circuit held that due process is violated if the government bases an indictment "partially on *perjured testimony*, when the perjured testimony is material, and when jeopardy has not attached."  497 F.2d at 785 (emphasis added).  Perjury is a "false sworn statement [a witness makes regarding] a material issue, believing [the statement] to be false."  A.R.S. § 13-2702(A)(1) (2001).  To determine whether *Basurto* is implicated, we review each of Detective Wright's statements to determine whether she committed perjury.

¶33     Detective Wright's first statement to the grand jury was that Carlos Logan told the arresting officer that he received the Suburban in a trade for cocaine.  Moody concedes that Detective Wright accurately reported to the grand jury what Logan told the arresting officer.  Thus, while the information

---

[3]     Moody argues that this court should reverse his convictions based on the prosecution's knowing presentation of false evidence.  *See United States v. Mudarris*, 695 F.2d 1182 (9th Cir. 1983) (holding that a defendant must prove "flagrant misconduct" to prevail on a challenge to an indictment).  We do not address this claim, however, because Moody failed to raise it before trial.  With the exception of a *Basurto* violation, a conviction precludes review of the finding of probable cause made by a grand jury.  *State v. Verive*, 128 Ariz. 570, 575, 627 P.2d 721, 726 (App. 1981) (noting that *Basurto* is the only exception to the rule that a "defendant cannot, by appeal from a conviction, obtain review of matters relevant only to the grand jury proceedings").

that Carlos Logan gave to the arresting officer might have been false, Detective Wright's reporting to the grand jury of that exchange between Logan and the arresting officer was not. Consequently, it was not perjurious and does not fall within the purview of *Basurto*, 497 F.2d at 784-86, and *Gortarez*, 141 Ariz. at 258, 686 P.2d at 1228.

¶34 Regarding her second statement, Detective Wright conceded at a pretrial hearing that Carlos Logan never told either the arresting or interviewing officer that Moody identified himself to Logan as "Bob." Detective Wright also admitted that the police reports did not specify Tucson as the location of the murders Moody allegedly bragged about committing. Thus, Detective Wright's grand jury testimony was false on these two points. However, our inquiry does not end there. To constitute perjury, the false sworn statement must relate to a material issue and the witness must know of its falsity. A.R.S. § 13-2702(A)(1).

¶35 A statement is material if it "could have affected the course or outcome of [a] proceeding." A.R.S. § 13-2701(1) (2001). The unchallenged evidence offered at the grand jury proceeding was overwhelming: In addition to the "Bob" and "Tucson" information, the grand jury also heard that Moody knew Michelle Malone and may have purchased cocaine from her in the

past; that a bullet found at the Malone murder scene came from a rifle found at Moody's residence; that after the murder, Moody pawned two guns taken from the Malone residence; that Moody lived next door to Patricia Magda and knew her; that Moody's wallet was found in Magda's car; that Magda's car was found at DeForest's Yuma, Arizona home; that Moody used Magda's credit card and bank card; and that Carlos Logan was arrested for driving Mary DeForest's stolen Suburban.

¶36     Because substantial evidence supports the finding of probable cause, neither false statement could reasonably have affected the grand jury's determination of probable cause. Thus, the requirement of materiality is not met as to the "Bob" and "Tucson" evidence.     As such, these two statements by Detective Wright, although false in the sense that they do not appear in the arresting officer's reports, do not constitute perjury.     Consequently, Moody's claim of a *Basurto* violation fails.

¶37     In the alternative, Moody argues that his convictions should be reversed because the prosecutor allowed Moody's trials to proceed knowing that the indictment was based in part on false evidence that had been presented to the grand jury. Citing *Basurto*, he asserts that the prosecutor should have disclosed this evidence to the court and to him upon discovery.

*See* 497 F.2d at 785-86 ("Whenever the prosecutor learns of any perjury committed before the grand jury, he is under a duty to immediately inform the court . . . ."). However, because no perjury was committed, the prosecutor violated no duty under *Basurto*. While a prosecutor must advise the court of false evidence presented at trial, *cf.* Ariz. R. Sup. Ct. 42, ER 3.3(a)(3) and 3.8 cmt. 1, Moody has cited no authority suggesting that presentation of false testimony to the grand jury on non-material issues requires reversal after guilt has been proved beyond a reasonable doubt at trial.

**C. Denial of Fair Trial by Use of False Evidence**

¶38         Moody asserts that the State denied him a fair trial by providing mental health experts with the transcript of the grand jury proceedings in which Detective Wright repeated the false Carlos Logan evidence. Moody claims that providing this evidence "tainted" the mental health experts' opinions by suggesting that Moody's actions were a product of cocaine addiction, not of mental illness. This evidence, he argues, caused the mental health experts to believe that any mental illness was therefore feigned.

¶39         Challenges to the admissibility of evidence can be preserved only by a motion to preclude that evidence or by a specific, contemporaneous objection to its admission. *State v.*

*Bolton*, 182 Ariz. 290, 306 n.5, 896 P.2d 830, 846 n.5 (1995). The motion or objection must state specific grounds in order to preserve the issue for appeal. *See State v. Briggs*, 112 Ariz. 379, 382, 542 P.2d 804, 807 (1975).

¶40     Moody filed a motion to preclude Dr. Potts' testimony, but that motion was based on the late disclosure of Dr. Potts' notes, not on an argument that Dr. Potts' testimony was tainted or reports were improper because of the doctor's exposure to the grand jury transcripts. Additionally, while Moody did move for a mistrial based on the prosecutor's use of the doctors' "tainted" opinions to impeach Dr. Goldberg's testimony, that motion did not come until the day after the challenged actions, and Moody made no contemporaneous objection to the prosecutor's use of Dr. Goldberg's opinions during the trial. Consequently, Moody has waived this claim as well. *See State v. Harris*, 157 Ariz. 35, 36, 754 P.2d 1139, 1140 (1988) (The purpose of the contemporaneous objection requirement is to allow the court to remedy objectionable action; a party cannot "permit an error to go unrectified and then [later] claim the right to a mistrial or a new trial."). Thus, we review Moody's challenges based on the use of the "Carlos Logan evidence" only for fundamental error. *See Bolton*, 182 Ariz. at 297, 658 P.2d at 837.

¶41     The Supreme Court has held that "a conviction obtained

through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). The Ninth Circuit has removed the knowledge requirement from the *Napue* equation: "[E]ven if the government unwittingly presents false evidence, a defendant is entitled to a new trial 'if there is a reasonable probability that [without the evidence] the result of the proceeding would have been different.'" *United States v. Young*, 17 F.3d 1201, 1204 (9th Cir. 1994) (alteration in original) (citation omitted). Moody urges this court to adopt the Ninth Circuit's analysis in *Young*. We need not decide whether to adopt the Ninth Circuit's rule, however, because even were we to do so, Moody's claim would fail.

¶42 Because Moody has waived this claim by failing to interpose timely objections or file a motion in limine, he must demonstrate that any error "contribut[ed] to or significantly affect[ed] the verdict." *State v. King*, 158 Ariz. 419, 424, 763 P.2d 239, 244 (1988). Moody makes no such argument. He argues only that "the State rendered the opinions of [the mental health experts] unreliable." An independent review of the record suggests, however, that the Carlos Logan evidence likely had little or no impact on the doctors' assessments or the jury's rejection of Moody's insanity defense.

¶43  Drs. Sullivan and Morenz were the only State experts to testify at trial regarding Moody's insanity defense. Dr. Sullivan opined that Moody was faking mental illness by malingering, but his testimony was based almost entirely on various tests other experts had administered to Moody. He was not cross-examined regarding the Carlos Logan evidence, and while Dr. Sullivan did have access to the opinions of Drs. Potts, LaWall, and Morenz — all of whom had been provided the grand jury transcripts — Moody offers no citations to the record showing that Dr. Sullivan ever had access to the grand jury transcripts or relied upon portions of the other doctors' reports that were based upon the grand jury transcripts. In fact, before trial defense counsel argued that the only reason the State asked Dr. Sullivan to testify was that he was *not* exposed to the Carlos Logan information and the State wanted to "sanitize" the trial by having an expert testify who had not been exposed to that information and therefore was not subject to impeachment on that score.

¶44  Dr. Morenz, on the other hand, did admit that he considered the Carlos Logan information in arriving at his opinion that Moody was malingering. He indicated on direct examination that the Logan evidence was one of eleven factors that he considered in reaching his conclusions. Defense counsel

then subjected Dr. Morenz to vigorous cross-examination that exposed to the jury that some of the information in the grand jury transcript was false and also exposed any possible prejudice Dr. Morenz might have developed from reading the grand jury transcript before meeting with Moody. This court has observed that cross-examination can place an expert's conclusions in context and help the jury appropriately weigh the testimony. *State v. Schackart*, 175 Ariz. 494, 502, 858 P.2d 639, 647 (1993) ("If the defense wishes to challenge the manner in which a mental examination has been conducted, or an expert's conclusions, this can be done on cross-examination or during the testimony of its own witness."); *see also State v. Mincey*, 141 Ariz. 425, 441, 687 P.2d 1180, 1196 (1984).

¶45    In light of all of the above — that Dr. Morenz appears to be the only expert at the second trial whose opinion was influenced even in part by the Logan evidence, that the Logan evidence supported only one of eleven bases for the doctor's conclusion that Moody was malingering, and that the doctor was subject to cross-examination sufficient to expose to the jury possible biases or flaws in his reasoning — Moody has not met his burden of demonstrating that the false information "contribut[ed] to or significantly affect[ed] the verdict." *King*, 158 Ariz. at 424, 763 P.2d at 244. We therefore conclude

- 24 -

that there was no fundamental error on this issue.

**D.    The Competency Findings**

**¶46**        Moody claims that the trial court deprived him of due process by failing to adjudicate him incompetent.  He argues that the trial judge erred by privately reviewing unidentified portions of the record in determining that Moody was competent, failing to conduct a competency hearing until just before commencement of the trial, applying the wrong standard of competency, and finding him competent despite insufficient evidence to support such a finding.  Consequently, Moody urges that his Fifth, Sixth, and Fourteenth Amendment rights were violated and that his convictions must be reversed.

1.    Unilateral Examination of Evidence

**¶47**        Moody alleges that the trial judge's review of the record on competency constituted an impermissible competency determination.  However, the record contains no evidence that defense counsel ever objected to the trial judge's review of the record on competency.  Consequently, Moody has waived this claim and we review only for fundamental error.  *See Bolton*, 182 Ariz. at 297, 896 P.2d at 837.

**¶48**        Moreover, Moody appears to misperceive the record. Arizona Rule of Criminal Procedure 11.5(a) and *State v. Blier*, 113 Ariz. 501, 503, 557 P.2d 1058, 1060 (1976), require that any

- 25 -

competency hearing be open to the parties and guarantee the right of the defendant to be present. A competency hearing is required, however, only "[i]f the court determines that reasonable grounds for an examination exist." Ariz. R. Crim. P. 11.3(a); *accord State v. Steelman*, 120 Ariz. 301, 315, 585 P.2d 1213, 1227 (1978); *State v. De Vote*, 87 Ariz. 179, 182, 349 P.2d 189, 192 (1960); *State v. Reid*, 87 Ariz. 123, 126, 348 P.2d 731, 733 (1960). In determining whether reasonable grounds exist, a judge may rely, among other factors, on his own observations of the defendant's demeanor and ability to answer questions. *See State v. Harding*, 137 Ariz. 278, 286, 670 P.2d 383, 391 (1983) (upholding a trial court's determination that a defendant was competent to waive his right to counsel based on psychiatric reports and the trial court's own observations). Further, if a defendant has already been adjudicated competent, the court must be permitted to rely on the record supporting that previous adjudication. *State v. Contreras*, 112 Ariz. 358, 360-61, 542 P.2d 17, 19-20 (1975) (holding that before granting a second competency hearing, "there must be some reasonable ground to justify another hearing on facts not previously presented to the trial court").

¶49 We presume that a court is aware of the relevant law and applies it correctly in arriving at its ruling. *See State*

*v. Medrano*, 185 Ariz. 192, 196, 914 P.2d 225, 229 (1996). With this presumption in mind, Moody's contention that the trial judge's pretrial review of the record on competency was an unlawful private "competency hearing" must be rejected. Rather, the record reflects that the trial judge's actions were consistent with his obligation under Rule 11.2 to seek "reasonable grounds" before ordering a subsequent competency evaluation. Each time the judge denied a defense motion for a competency hearing, he indicated that the proffered evidence gave him no reason to question Moody's competency, which had previously been determined. This interpretation is supported by the fact that the trial judge never expressly "found" Moody competent, as would be required after a full Rule 11.5 competency hearing. *See* Ariz. R. Crim. P. 11.5(a). When finally presented with evidence that could possibly lead to reasonable grounds to question Moody's competency, the trial judge scheduled a hearing to determine whether such grounds existed.[4] We find no error in the trial judge's conduct, and

---

[4] Dr. Goldberg prepared a report detailing the observations he made after four days of meetings with and examinations of Moody in February 2001. On March 1, 2001, the trial court indicated that Dr. Goldberg's report raised "concerns about [Moody's competence] that we should resolve before trial." Consequently, the court held a hearing on May 7, 2001, with Moody, defense counsel, and the prosecutor present. Dr. Goldberg, the only expert to testify at the hearing, explained

certainly none that constitutes "error of such dimensions that it cannot be said it is possible for [the] defendant to have had a fair trial." *State v. Smith*, 114 Ariz. 415, 420, 561 P.2d 739, 744 (1977).[5]

## 2. Application of the Wrong Standard

¶50 Moody claims that the trial judge applied the wrong standard in adjudicating him competent to stand trial. He notes that the standard for competency under *Dusky v. United States*, 362 U.S. 402 (1960), is two-pronged: The court must be satisfied (1) that the defendant has a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and (2) that he has a "rational as well as factual understanding of the proceedings against him." Moody claims that the trial court applied only the second part of that standard and ignored whether he had the ability to assist counsel when it denied his motion for a Rule 11 hearing. Moody

---

his conclusion that Moody was "unreliable and inconsistent in his abilities" to assist counsel, but that he was able to complete the tests administered to him, his memory was average, and he recognized the doctor each time he was visited. Dr. Goldberg never opined that Moody was incompetent to stand trial and the trial judge did not find him to be so.

[5] Because we conclude that the hearing before trial was not a "competency hearing" but rather a hearing to determine whether there were reasonable grounds to require a competency hearing, we find no error in the trial court waiting until the eve of trial to conduct such a hearing.

bases his argument on the trial judge's statement that "Moody knows who his lawyer is, he knows who the judge is, he certainly knows who Mr. White is, and he knows what he's charged with."

¶51    This argument suffers from the same misunderstanding that doomed Moody's previous claim, namely, the failure to distinguish between a determination of whether reasonable grounds exist to justify a competency hearing and findings following an actual competency hearing. The cited statement was made in response to Moody's motion for a Rule 11 hearing. Thus, it was clearly a statement of reasonable grounds, not an adjudication of competency.

¶52    Because this statement did not resolve an adjudication of competency, the incomplete rendition of the competency standard does not by itself require reversal. Rather, the critical inquiry is whether the trial court actually applied the correct standard in determining that reasonable grounds did not exist to call for a competency hearing. *See, e.g., State v. Borbon*, 146 Ariz. 392, 395, 706 P.2d 718, 721 (1985). "Reasonable grounds exist if there is sufficient evidence to indicate that the defendant is not able to understand the nature of the proceedings against him and to assist in his defense." *State v. Salazar*, 128 Ariz. 461, 462, 626 P.2d 1093, 1094 (1981).

¶53    We presume that a court is aware of the relevant law and applies it correctly in arriving at its rulings. *See Medrano*, 185 Ariz. at 196, 914 P.2d at 229. After reviewing a report from Dr. Goldberg stating that Moody was "unable to **reliably** and **consistently** assist his counsel at this time" (emphasis in original), the trial judge "confess[ed] to having some concerns at this point about the record on competence." Because Dr. Goldberg's report was focused on Moody's inability to consistently assist counsel, the trial judge's concerns about competency after reading that report show that he was aware of the relevant standard. In light of this record, and the presumption that the trial judge is aware of the proper standard on competency, we cannot agree with Moody's argument that the trial court's lone statement in denying a motion for a Rule 11 hearing constitutes reversible error. *See id.* (rejecting a defendant's argument that the trial judge based his decision on inappropriate considerations, finding that the remainder of the record showed that the court was aware of and correctly applied the relevant law).

   3.   Insufficient Evidence

¶54    Moody asserts that there was insufficient evidence to support a finding of competency in this case. Specifically, he claims that there was no reasonable evidence that he was capable

of assisting counsel. As a result, he argues, the case law requires that his convictions be reversed. *See Pate v. Robinson*, 383 U.S. 375 (1966); *Dusky*, 362 U.S. at 402–03; *State v. Bishop*, 162 Ariz. 103, 781 P.2d 581 (1989).

¶55 We will upset a trial court's determination of a criminal defendant's competency only for an "abuse of discretion." *State v. Silvas*, 91 Ariz. 386, 391, 372 P.2d 718, 722 (1962) (citing *Reid*, 87 Ariz. at 123, 348 P.2d at 731).

¶56 Arizona Rule of Criminal Procedure 11.1 states that "[a] person shall not be tried, convicted, sentenced or punished for a public offense . . . while, as a result of a mental illness, defect, or disability, the person is unable to understand the proceedings against him or her or to assist in his or her own defense." Rule 11.1 defines "mental illness, defect or disability" as "a psychiatric or neurological disorder that is evidenced by behavioral or emotional symptoms." However, the mere presence of a mental illness, defect, or disability "is not grounds for finding a defendant incompetent to stand trial." Ariz. R. Crim. P. 11.1. Rather, the test for competency is whether that mental illness or defect renders a criminal defendant "unable to understand the proceedings against him or her or to assist in his or her own defense." *Id.*

¶57 Immediately before the second trial, the court held a

- 31 -

hearing at which Dr. Goldberg testified about Moody's difficulties in assisting counsel. Following that hearing, the trial judge affirmed an earlier ruling that he had no grounds to question Moody's competency to stand trial. Moody asserts that this was error.

¶58    There is no evidence before this court, however, that the trial judge abused his discretion in finding Moody competent to stand trial or, conversely, in failing to find Moody incompetent to stand trial. In addition to the avowal of one of Moody's own attorneys that Moody was in fact competent and the judge's own observations, the trial judge also had before him the opinions of Drs. Potts, LaWall, Geffen, Morenz, and Sullivan, all of whom indicated that, despite his personality disorders, Moody was likely malingering or faking mental illness and was capable of assisting defense counsel. Dr. Goldberg was the only expert who testified at the May 7, 2001 hearing, and even he testified only that Moody was "unreliable and inconsistent in his abilities" to assist defense counsel. Inconsistency in assisting counsel may fall short of inability to do so, the standard set forth in Rule 11.1. Moreover, the trial judge might have found Dr. Goldberg's testimony less credible than that of the other doctors. Consequently, without any further showing, we cannot conclude that the trial judge

abused his discretion in failing to find Moody incompetent to stand trial.  *See Silvas*, 91 Ariz. at 391, 372 P.2d at 722 (applying abuse of discretion standard).

**E.   Violation of Right to Counsel**

**¶59**      Moody next argues that evidence obtained in violation of his right to counsel was used to undermine his insanity defense and influence the court's determination of his mental competence.   Moody raises two claims arising from this alleged violation of his rights:   first, that the State violated his right to counsel when it ignored his request for an attorney before taking handwriting, fingerprint, blood, and hair samples; and, second, that the State intruded into the attorney-client relationship by making derogatory comments about counsel and eavesdropping on a telephone conversation between Moody and his attorney.

   1.   Physical Evidence

**¶60**      Moody contends that by refusing to honor his request for counsel after he was served with the search warrant for physical characteristics, the State violated his right to counsel.

**¶61**      Shortly after Moody was extradited to Arizona, Tucson Detective Karen Wright and Pima County Detective Michael Ying served him with a search warrant seeking "physical

characteristics," such as hair, blood, fingerprints, and handwriting samples. Moody indicated that he had no attorney and requested a public defender. After contacting the prosecutor, however, the detectives denied his request. Moody then complied with the warrant and gave samples of hair and blood, was fingerprinted and photographed, and gave a handwriting sample. Before his second trial, Moody moved to suppress this evidence. The trial court denied that motion and the State presented the evidence at trial.

¶62 As relief for the asserted violation of his rights, Moody claims that the trial court should have suppressed this evidence. We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion if it involves a discretionary issue, *see State v. Prion*, 203 Ariz. 157, 160, ¶ 14, 52 P.3d 189, 192 (2002), but review constitutional issues and purely legal issues de novo, *see State v. Davolt*, 207 Ariz. 191, 201, ¶ 21, 84 P.3d 456, 466 (2004) (analyzing Fourth and Fifth Amendment issues).

¶63 Moody's pretrial motion to suppress was based on Arizona Rule of Criminal Procedure 15.2(a), which guarantees a criminal defendant the right to have counsel present during the taking of physical evidence. Moody does not rely on Rule 15.2 on appeal, however, and we therefore do not analyze that claim.

¶64    Instead, on appeal, Moody relies upon two additional arguments raised but not ruled upon below:  a Sixth Amendment right to have counsel present and a general right to "access" counsel derived from a line of driving under the influence ("DUI") cases based on Rule 6.1(a) of the Arizona Rules of Criminal Procedure.

¶65    On the first issue, federal case law is clear that Moody had no right to have counsel present at the taking of physical evidence.  The Sixth Amendment right to counsel extends to "all critical stages of the criminal process." *Iowa v. Tovar*, ___ U.S. ___, ___, 124 S. Ct. 1379, 1383 (2004).  The taking of non-testimonial physical evidence, however, is not a critical stage of the proceedings.  *See, e.g., Gilbert v. California*, 388 U.S. 263, 267 (1967) (holding that taking of a handwriting sample is not a "critical stage" of the proceedings); *United States v. Jackson*, 448 F.2d 963, 971 (9th Cir. 1971) (holding that taking of fingerprints and hair samples is not a "critical stage" of the proceedings); *cf. United States v. Wade*, 388 U.S. 218, 227-28 (1967) (stating that *analysis* of fingerprints, blood, and hair is not a critical stage because "there is minimal risk that his counsel's absence at such stages might derogate from his right to a fair trial").  Consequently, Moody had no right to have the evidence suppressed based on the

denial of his Sixth Amendment rights.

¶66     Second, Moody argues that by refusing his custodial request to speak with counsel before the taking of the physical evidence, the State interfered with his rule-based "right of access to counsel" and that the evidence should therefore have been suppressed.  Rule 6.1(a) of the Arizona Rules of Criminal Procedure provides a criminal defendant with the right to "consult in private with an attorney . . . as soon as feasible after [being] taken into custody."  This court has stated that, regarding a suspect in custody, the state may deny the right to consult with an attorney "only when the exercise of that right will hinder an ongoing investigation." *Kunzler v. Pima County Superior Court*, 154 Ariz. 568, 569, 744 P.2d 669, 670 (1987).  Although the State has not shown that counsel would have hindered the investigation in this case, Moody had not been assigned an attorney when the warrant was served.  This court has also stated that "[i]f the defendant is indigent and cannot afford an attorney, the state need not wait until one is appointed before continuing its detention procedures." *McNutt v. Superior Court*, 133 Ariz. 7, 10 n.2, 648 P.2d 122, 125 n.2 (1982).  The taking of the fingerprint evidence would clearly qualify under this exception for detention procedures.

¶67     Even if this court were to conclude that Moody's right

to consult counsel under Rule 6.1(a) was violated as to the other evidence, however, Moody fails to demonstrate that suppression would be required. Federal jurisprudence is clear that if evidence could have been obtained despite the violation of right to counsel, there is no reason to keep that evidence from the jury. *Nix v. Williams*, 467 U.S. 431, 447 (1984). For suppression to be appropriate, there must be a nexus between the violation and the evidence seized. *Id.* (stating that the exclusionary rule requires the suppression of evidence gained as a result of a government violation of a defendant's rights).[6] In Moody's case, the physical evidence was seized pursuant to a valid warrant, and the samples would have been collected whether or not Moody had an opportunity to speak with an attorney. Consequently, the nexus between the alleged violation and the evidence seized is absent; therefore, the policies underlying the exclusionary rule would not require suppression of this evidence.

¶68     Moody relies on a line of cases based on Rule 6.1 of the Arizona Rules of Criminal Procedure for the proposition that

---

[6]     The federal exclusionary rule is not directly applicable because we are dealing with a rule-based right to counsel rather than a constitutional claim. However, we believe that the defendant must demonstrate some connection between a Rule 6.1(a) violation and the evidence seized before suppression is required.

a defendant has the right to confer with counsel before taking a test for physical evidence. Those cases, however, all involve and are limited to the seizure of evidence of intoxication. *See, e.g., Kunzler*, 154 Ariz. at 568-70, 744 P.2d at 669-71; *State v. Holland*, 147 Ariz. 453, 711 P.2d 592 (1985); *McNutt*, 133 Ariz. at 7, 648 P.2d at 122; *State v. Rosengren*, 199 Ariz. 112, 14 P.3d 303 (App. 2000). Only in these cases has the reviewing court either dismissed the charges against the defendant or affirmed suppression of non-testimonial, physical evidence as a sanction for the state's violation of a defendant's rights under Rule 6.1(a).

¶69        These cases addressed violations of Rule 6.1 in the context of impaired drivers. *See Kunzler*, 154 Ariz. at 568, 744 P.2d at 669 (DUI); *Holland*, 147 Ariz. at 454, 711 P.2d at 593 (DUI); *McNutt*, 133 Ariz. at 8, 648 P.2d at 123 (DUI); *Rosengren*, 199 Ariz. at 115, 14 P.3d at 306 (manslaughter). Such investigations raise unique concerns that justify exemption from the general rule:

> In a D[U]I investigation, it is crucial for both the state and the defendant to gather evidence relevant to intoxication close in time to when the defendant allegedly committed the crime. Otherwise, any alcohol that may have been in the blood will have decomposed before the blood can be tested.

*McNutt*, 133 Ariz. at 10 n.2, 648 P.2d at 125 n.2. As the court suggested in *McNutt*, DUI investigations are unique because of

- 38 -

the evanescent nature of blood- and breath-alcohol evidence. *See id.* Thus, these DUI cases establish the required nexus between the violation and remedy: Denial of counsel may deprive a defendant of an opportunity to obtain exculpatory evidence and therefore justifies suppression of evidence. *Id.* at 10, 648 P.2d at 125.

¶70 Moody's case differs in that the physical evidence taken from him was not subject to disappearing or dissipating as is breath- or blood-alcohol evidence. The officers made it clear that the warrant sought only non-testimonial evidence and that they would not be asking Moody any questions regarding the murders while taking the evidence. Additionally, because the evidence was seized pursuant to a valid warrant,[7] it is unlikely that an attorney would advise Moody to defy the warrant and

---

[7] Moody claims that the search warrant that authorized the taking of physical evidence was invalid because it was not "completely recorded as required by statute." We disagree. Although the transcript of the recorded affidavit supporting the warrant shows that the recording cut off the court's order authorizing the warrant, the tape contains the affiant detective's oath, her description of the facts of the case, the substantial evidence linking Moody to the crime, Moody's name, and a complete list of physical evidence requested. Arizona's statute governing telephonic search warrants, A.R.S. § 13-3914(C) (1989), requires only that the affiant's statement of facts that establish the grounds for the warrant be recorded. Moody cites no case law suggesting that this is insufficient under § 13-3914(C) and we find no defect in the recording of the warrant.

refuse to submit to the search.[8]  For those reasons, we agree

with those courts that have held that the necessity for counsel

was minimized.  *E.g., Nix*, 467 U.S. at 446-47.  Consequently,

even if Rule 6.1(a) requires that a defendant be afforded the

opportunity to contact counsel before administration of a search

warrant for physical characteristics, Moody has failed to

demonstrate why suppression would be appropriate in this case.

He therefore has not shown that the trial court abused its

discretion in denying his motion to suppress the physical

evidence.

        2.    Intrusion into the Attorney-Client Relationship

**¶71**      Moody claims that the State interfered in his

relationship with counsel in two ways during a two-month span at

the beginning of Moody's detainment in early 1994.

**¶72**      In February of 1994, a Pima County corrections officer

---

[8]      Moody cites *Rosengren*, 199 Ariz. at 121, ¶ 30, 14 P.3d at
312, arguing that "the State cannot bypass the requirement of
counsel by using a warrant."  Moody accurately cites *Rosengren*'s
holding.  Moreover, his reliance on it is misplaced.  In
*Rosengren*, the defendant requested an attorney twice before
police officers sought a search warrant.  *Id.* at 115, ¶¶ 4, 5,
14 P.3d at 306.  Consequently, it was clear that the officers in
that case sought a warrant to prevent the defendant from
exercising his right to contact counsel.  In the current case,
Moody did not request counsel until he was confronted with the
warrant.  Thus, while Rosengren's rights to counsel were clearly
subverted by the state's decision to obtain a warrant, no such
claim can be made here.

made derogatory statements about Moody's first attorney, Daniel Grills. When Grills brought this to the court's attention, Judge Hantman ordered the Sheriff's Department to avoid contact with Moody concerning legal matters. The State contends that this error was remedied by our decision in *State v. Moody*, 192 Ariz. 505, 968 P.2d 578 (1998). We agree. Moody has failed to explain how, if at all, any prejudice stemming from this incident survived the reversal and affected him on retrial. Consequently, we address only Moody's second claim.

¶73    Two months later, on April 4, 1994, Pima County Corrections Officer Alan Chaffey, who had previously been instructed by his supervisor to "keep an eye on Mr. Moody" and report any observations he found interesting, overheard Moody make a phone call to his attorney in which Moody discussed his idea for a legal defense that he had "read about . . . in two books." Officer Chaffey then searched Moody's cell and discovered two books about alien abduction: *Communion* and *The Breakthrough, Communion Continues*.

¶74    Before retrial, Moody moved to dismiss the charges against him, alleging that the State intentionally interfered in the attorney-client relationship. The trial court denied that motion without elaboration. Contending that the prosecutor took deliberate actions to "penetrate the attorney-client privilege

and destroy counsel's relationship with his client," Moody now claims that the trial court erred in denying the motion and asks us to vacate his convictions and dismiss the charges against him.

¶75    We review a trial court's ruling on a motion to dismiss for an abuse of discretion. *State v. Hansen*, 156 Ariz. 291, 294, 751 P.2d 951, 954 (1988) (citing *State v. Pickett*, 121 Ariz. 142, 145, 589 P.2d 16, 19 (1978)).

¶76    The Sixth Amendment to the United States Constitution and Article 2, Section 24 of the Arizona Constitution guarantee a criminal defendant the right to assistance of counsel. This right includes "protection against improper intrusions by the prosecutor or other government agents into the confidential relationship between a defendant and his attorney." *State v. Warner*, 150 Ariz. 123, 127, 722 P.2d 291, 295 (1986). We recognize that "effective representation is not possible without the right of a defendant to confer in private with . . . counsel." *Holland*, 147 Ariz. at 455, 711 P.2d at 594; *see also* Ariz. R. Crim. P. 6.1(a).

¶77    The defendant bears the initial burden to establish an interference in the attorney-client relationship. Once he does so, the state bears the burden of demonstrating that the defendant was not prejudiced by the interference and must

convince the court beyond a reasonable doubt that the defendant received a fair trial. *Warner*, 150 Ariz. at 128, 722 P.2d at 296.

¶78    Addressing the first part of this equation, Moody claims that the correction officer's actions in eavesdropping on his conversation interfered with his relationship with counsel. The relevant inquiry, however, is whether the state interfered with "the *confidential* relationship between a defendant and his attorney." *Id.* at 127, 722 P.2d at 295 (emphasis added). The State argues that Moody waived his interest in the confidentiality of the telephone call and that the corrections officer did not interfere in a *confidential* attorney-client relationship. The evidence showed that Officer Chaffey was sitting approximately fifteen feet from Moody during the conversation; that Moody knew the officer was there but made no attempt to protect the contents of his conversation by turning his back, speaking softly, or covering his mouth; and that Officer Chaffey did not have to listen closely or eavesdrop to hear what Moody was saying.

¶79    Although not binding on our resolution of confidentiality requirements, our case law on evidentiary privilege is instructive. The cases suggest that one who knows that his conversation may be overheard and makes no effort to

safeguard against interception may waive a claim of confidentiality. In *De Leon v. Territory*, 9 Ariz. 161, 168-69, 80 P. 348, 351 (1905), Arizona's landmark case on privilege, this court held that the defendant waived his spousal communications privilege when he wrote a letter to his wife from jail knowing that the jailers would open the letter. Similarly, in *State v. Summerlin*, 138 Ariz. 426, 434-35, 675 P.2d 686, 694-95 (1983), we held that the spousal communication privilege was waived because the defendant spoke to his wife knowing that police officers could hear him and were listening to him. And the court of appeals recently held that "[t]he presence of a third person will usually defeat the [attorney-client] privilege on the ground that confidentiality could not be intended with respect to communications that the speaker knowingly allowed to be overheard by others foreign to the confidential relationship." *State v. Sucharew*, 205 Ariz. 16, 22, ¶ 11, 66 P.3d 59, 65 (App. 2003) (quoting Morris K. Udall, et al., *Law of Evidence* § 71, at 128 (3d. ed. 1991)) (alteration in original). While some factual distinctions exist, this case law suggests that Moody knowingly waived his privacy interest in the content of the conversation.

¶80    Although eavesdropping on privileged calls and opening privileged materials intrude into the attorney-client

- 44 -

relationship, *see State v. Pecard*, 196 Ariz. 371, 376-78, ¶¶ 26-37, 998 P.2d 453, 458-60 (App. 1999) (finding an intrusion into the attorney-client relationship where defendant's telephone calls with his attorney were recorded, his privileged mail to and from his attorney was opened, and privileged work product documents were taken from his cell), the facts in Moody's case are not nearly so extreme. There was no surreptitious eavesdropping, recording, or reporting of communications or affect that were not readily apparent to anyone who had been in the vicinity.

¶81 Although the trial court's denial of Moody's motion to dismiss included no specific findings, we presume that the court was aware of the relevant law and applied it correctly in arriving at its ruling, *see State v. Medrano*, 185 Ariz. 192, 196, 914 P.2d 225, 229 (1996), and we can affirm the ruling on any basis supported by the record. *See State v. Robinson*, 153 Ariz. 191, 199, 735 P.2d 801, 809 (1987) (reviewing evidentiary rulings). Based on the evidence before us, we find no abuse of discretion. The trial judge may have found the corrections officer's testimony credible, a determination to which we would defer. *See State v. Hughes*, 13 Ariz. App. 391, 393, 477 P.2d 265, 266-67 (1970) (deferring to the trial court's credibility evaluation). On the basis of that testimony, the trial court

may reasonably have concluded that Moody waived the confidentiality of the communication with his attorney by making no effort to safeguard the content of his conversation. Thus, we cannot conclude that the trial court abused its discretion in denying this motion to dismiss.

¶82    Because we conclude there was no intrusion into the attorney-client relationship, we need not address whether Moody was prejudiced by any intrusion. Similarly, we need not address how, if at all, Moody was prejudiced by the prosecution forwarding Officer Chaffey's report to the mental health experts. Chaffey discovered the books during a routine investigation of Moody's cell. The overheard telephone conversation is necessary to give context to the books sufficient to raise a claim that the discovery inculpated the attorney-client relationship. Consequently, our conclusion that the trial court did not err in finding that Moody waived any confidentiality interest resolves this issue as well.

**F.    Death Qualification of the Jury**

¶83    Moody argues that he was denied an impartial and representative jury by the trial court's decision to "death qualify" the jurors — that is, to ascertain whether they had any feelings about the death penalty that would have interfered with their ability to follow the law. Moody alleges two errors, one

general and one specific. First, he argues that "death qualification" is unconstitutional and should be disallowed. Second, he alleges that the trial judge's removal of four individual panel members for cause was an abuse of discretion and violated his right to a representative jury.

¶84 On the first issue, Moody concedes that this court has consistently upheld death qualification. *E.g., State v. Montaño*, 204 Ariz. 413, 422, ¶ 36, 65 P.3d 61, 70 (2003) (citing *State v. Hoskins*, 199 Ariz. 127, 141-42, ¶ 50, 14 P.3d 997, 1011-12 (2000)); *see also State v. Jones*, 197 Ariz. 290, 302, ¶ 24, 4 P.3d 345, 357 (2000); *State v. Kayer*, 194 Ariz. 423, 431, ¶ 22, 984 P.2d 31, 39 (1999). He asks us to reconsider these holdings. While duly noted, Moody's arguments are mere reprises of arguments that this court has previously rejected. *See Hoskins*, 199 Ariz. at 141-42, ¶ 49, 14 P.3d at 1011-12. In light of the amendment to A.R.S. § 13-703.01 (Supp. 2003) that now permits jury sentencing, we decline to revisit our earlier holdings on the constitutionality of death qualification of juries.

¶85 Moody's second claim challenges the removal of four jurors based on their personal opposition to the death penalty. Moody did not contemporaneously object to the removal for cause of any of these jurors. While defense counsel did lodge a

general objection to death qualification before passing the panel, we have held that "a general objection to death penalty questioning does not serve as an objection to preserve on direct appeal the issue of whether individual jurors were improperly dismissed for cause because of their death penalty views." *Montaño*, 204 Ariz. at 422, ¶ 37, 65 P.3d at 70 (quoting *Kayer*, 194 Ariz. at 432, ¶ 24, 984 P.2d at 40). Because defense counsel failed to object to the individual dismissal of the jurors in question, we review only for fundamental error. *See id.*

¶86    Fundamental error is "error of such dimensions that it cannot be said it is possible for a defendant to have had a fair trial." *State v. Smith*, 114 Ariz. 415, 420, 561 P.2d 739, 744 (1977). There was no such error here.

¶87    In this case, the trial judge asked the jury pool whether any member "would not be able to serve as a fair and impartial juror" in light of his or her view on the death penalty. Of the eight individuals who indicated that their personal views might affect their ability to be fair and impartial, four were removed after extensive questioning and several unsuccessful attempts at rehabilitation, and one juror was removed immediately upon indicating his fervent support of capital punishment. The two potential jurors who indicated that

they could set aside their feelings and be impartial remained on the panel, but were not ultimately selected to be on the jury. The final juror who had strong personal feelings about the death penalty was eventually excused because she had been exposed to news accounts of the murders and had a professional association with one of Moody's defense lawyers.

¶88    The Supreme Court has held that potential jurors may not be removed for cause "simply because they voiced general objections to the death penalty." *Witherspoon v. Illinois*, 391 U.S. 510, 522-23 (1968).  However, the trial judge is permitted to question jurors regarding their opinions on the death penalty, *see, e.g., State v. Anderson*, 197 Ariz. 314, 318-19, ¶¶ 7-10, 4 P.3d 369, 373-74 (2000), and, after attempting rehabilitation, may remove a potential juror from the jury pool if the juror's personal views may "prevent or substantially impair the performance of [the juror's] duties." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)).  Deference is to be accorded to the trial judge and a juror's bias need not be proved with unmistakable clarity. *Id.* at 424-25.

¶89    In *Montaño*, we upheld the for-cause dismissal of a juror whose equivocations were much less substantial than any juror excused for cause in this case.  *See* 204 Ariz. at 422-23,

¶¶ 38-39, 65 P.3d at 70-71. Moody urges us to apply a much stricter standard, arguing for application of the standard we applied in *Anderson*, 197 Ariz. at 320, ¶ 11, 4 P.3d at 375 (suggesting that a judge may remove a juror only if the juror "unequivocally express[es] an inability to follow the law and the judge's instructions"). As the State notes, however, *Anderson* involved a unique situation in which the trial court administered a written jury questionnaire and refused to allow follow-up questioning by counsel. *Id.* at 319, ¶ 10, 4 P.3d at 374. We held, in that situation, that a judge may base dismissal of jurors solely on how they answer their jury questionnaires only if their answers reveal an unequivocal expression of an inability to follow the law. *Id.* This case differs from *Anderson* because any equivocation expressed by the challenged jurors in this case appears to be the very product of extensive questioning, not a result of its absence.

¶90      Reviewing the record for fundamental error, we agree with the State that "the trial judge excused only the 'extreme' members of the panel on both sides of the death penalty question." There was no error here, and certainly none "of such dimensions that it cannot be said it is possible for a defendant to have had a fair trial." *Smith*, 114 Ariz. at 420, 561 P.2d at 744. Consequently, we fail to find that the trial court

committed fundamental error by excusing these four potential jurors because their views on the death penalty might have affected their ability to serve as fair and impartial jurors.

**G.   Failure to Ask Proposed Voir Dire Questions**

¶91        Moody argues that, despite assurances that the parties would be permitted to use jury questionnaires, the trial court first refused to use his questionnaire and then failed to adequately question prospective jurors on the questions covered in the proposed questionnaire during the jury selection process. He claims these errors deprived him of his rights to due process and a fair and impartial jury.

¶92        We address each claim individually.

### 1.   Failure to Administer Questionnaire

¶93        Moody claims that the trial court erred both by refusing to administer his proposed jury questionnaire and by giving a factually incorrect reason for doing so.  On the first point, we note that there is no right to use jury questionnaires in Arizona.   Rule 18.5(d) of Arizona's Rules of Criminal Procedure commands the court to conduct a "thorough oral examination of prospective jurors" and, upon request of a party, requires the court to "permit that party a reasonable time to conduct a further oral examination of the prospective jurors." Nothing in the language of Rule 18.5, however, creates a *right*

to use jury questionnaires. *See State v. Davolt*, 207 Ariz. 191, 207, ¶ 52, 84 P.3d 456, 472 (2004); *State v. Cañez*, 202 Ariz. 133, 148, ¶ 37, 42 P.3d 564, 579 (2002). Rather, whether to permit the use of jury questionnaires is a decision committed to the sound discretion of the court. *Cañez*, 202 Ariz. at 148, ¶ 37, 42 P.3d at 579. "We will not disturb the trial court's selection of the jury in the absence of a showing that a jury of fair and impartial jurors was not chosen." *Walden*, 183 Ariz. at 607, 905 P.2d at 986 (quoting *State v. Tison*, 129 Ariz. 546, 551, 633 P.2d 355, 360 (1981)). Moody fails to show either an abuse of discretion or that the jury selected was not fair and impartial.

¶94 Moody's second argument regarding the questionnaire is that "the trial court's stated reason for rejecting the written questions was factually incorrect, i.e., that it never intended to give a written questionnaire." He cites *State v. Chapple*, 135 Ariz. 281, 297, 660 P.2d 1208, 1224 (1983), in support of his arguments. In *Chapple*, however, we concluded not that the trial judge gave a "factually incorrect reason" for precluding an expert witness, but rather that he came to an incorrect *legal* conclusion. *Id.* *Chapple* therefore provides no support for Moody's position, and Moody makes no other legal argument in support of his contention. Moreover, Moody does not show where

in the record the trial judge stated that he would give a questionnaire. In sum, Moody has not established any grounds for reversal on this point.

### 2. Failure to Adequately Question Prospective Jurors

¶95    Moody also argues that the trial judge's refusal to use the questionnaire resulted in the failure to ask several questions necessary to ensure a fair and impartial jury. To succeed on a claim that the court failed to adequately question the jury panel, Moody must demonstrate not only that the voir dire examination was inadequate, but also that, as a result of the inadequate questioning, the jury selected was not fair, unbiased, and impartial. *See Walden*, 183 Ariz. at 607, 905 P.2d at 986. He does not meet this burden.

¶96    Moody's brief does set forth several groups of questions from the questionnaire that he asserts were not specifically explored on voir dire: jurors' experience with dissociative identity disorder, the effects of cocaine, and the credibility of police officers. He concedes that the trial court asked general questions covering each of these areas with much broader strokes — asking, for example, about jurors' experiences with mental illness, drugs and alcohol, and law enforcement. He urges, however, that the questions did not go far enough.

- 53 -

¶97     Moody's claims are nearly identical to the ones this court rejected in *Walden*, 183 Ariz. at 608, 905 P.2d at 987. In that case, a defendant whose jury questionnaire was not used at trial claimed that "although many of his questions were adequately covered by the court, other relevant and appropriate ones were not." *Id.* We found no error in Walden's case because he made "no attempt to show how the absence of any particular question or subject of questioning resulted in a biased jury or rendered his trial fundamentally unfair." *Id.* Rather, he made "only the general claim that each question was necessary to uncover juror bias." *Id.* The same is true here. Moody does not show how the absence of any of the questions resulted in a jury that was not fair and impartial.

¶98     Ultimately, even had Moody provided a more specific argument on this point, the trial judge's invitation to counsel to ask follow-up questions mitigates any deficiency in the court's questioning. This court has consistently upheld trial courts' refusals to use jury questionnaires when counsel were provided an opportunity to voir dire potential jurors. *See, e.g., Davolt*, 207 Ariz. at 207, ¶ 52, 84 P.3d at 472; *Cañez*, 202 Ariz. at 148, ¶ 37, 42 P.3d at 579. It also follows that a defendant who believes a trial court's voir dire to be deficient cannot sit on his rights and bypass the opportunity to cure the

error by questioning jurors about those subjects that he feels were inadequately addressed when offered the opportunity to do so.

¶99       In this case the trial judge invited counsel to voir dire the panel, and he allowed counsel to ask follow-up questions to individual jurors throughout the selection process. Moody has not alleged that his opportunity for follow-up questioning was limited or restricted, and because he could have asked the questions himself that he now claims should have been asked, we find no error or abuse of discretion in the voir dire process.

¶100      Based on the record before us, we find no abuse of discretion in the trial court's actions, and Moody fails to demonstrate how any of the errors he alleges served to deprive him of a fair, impartial, and unbiased jury.

**H.    Improper Expert Testimony**

¶101      Moody contends that the State's mental health expert, Dr. Morenz, invaded the province of the jury. Moody alleges error in two different statements:  that Moody committed these murders because of his cocaine use and that malingering is "a medical term for lying."[9]

---

[9]    In the "fact" section of his brief, Moody also mentioned Dr. Morenz's testimony about Moody's motive for turning himself

- 55 -

¶102     As an initial matter, we note that Moody did not object at trial to either statement by Dr. Morenz. This court has long held that an appellant may not challenge on appeal testimony to which there has been no objection, unless the error is fundamental. *State v. Thomas*, 130 Ariz. 432, 435, 636 P.2d 1214, 1217 (1981). We therefore review each statement only for fundamental error. *See State v. Bolton*, 182 Ariz. 290, 297, 896 P.2d 830, 837 (1995); *see also State v. King*, 158 Ariz. 419, 424, 763 P.2d 239, 244 (1988) (defining and reviewing for fundamental error).

### 1.  Opinion Testimony on Motive

¶103     Moody first alleges error in Dr. Morenz's testimony about Moody's possible motive for the murders. At trial, Dr. Morenz testified that, in his opinion, it was "very likely that the motivation [for the murders] was money and cocaine." Moody alleges that this was inappropriate opinion testimony permitted by neither the Arizona Rules of Evidence nor our case law on expert testimony.

---

in to police, but he made no argument regarding it. Merely mentioning an argument is not enough: "In Arizona, opening briefs must present significant arguments, supported by authority, setting forth an appellant's position on the issues raised. Failure to argue a claim usually constitutes abandonment and waiver of that claim." *State v. Carver*, 160 Ariz. 167, 175, 771 P.2d 1382, 1390 (1989). Consequently, we do not address the propriety of this testimony.

¶104     Arizona Rule of Evidence 702 provides that an expert witness may testify on any subject if the witness's "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."  This court has interpreted Rule 702 to preclude expert testimony, however, if "the subject of inquiry is one of such common knowledge that people of ordinary education could reach a conclusion as intelligently as the witness."  *State v. Poland*, 144 Ariz. 388, 398, 698 P.2d 183, 193 (1985) (quoting *State v. Owens*, 112 Ariz. 223, 227, 540 P.2d 695, 699 (1975)).

¶105     Moody alleges that Dr. Morenz exceeded the permissible scope of Rule 702 by testifying that Moody's cocaine use was a motive for the murders.  Moody contends that although Dr. Morenz could express an opinion on whether Moody was suffering from mental illness, "he was not permitted to offer an opinion that Robert killed Michelle Malone and Patricia Magda because of his cocaine use."  Moody argues that because there was no evidence that he had used cocaine at the time of the murders, and therefore no foundation for the opinion, Arizona case law renders Dr. Morenz's testimony improper.  *See State v. Miles*, 186 Ariz. 10, 18, 918 P.2d 1028, 1036 (1996) (upholding trial court's decision to preclude defense expert's testimony on cocaine intoxication where the expert "had no basis upon which

to render an opinion about the effects of crack cocaine use at the time of the murder"); *State v. Gretzler*, 126 Ariz. 60, 85, 612 P.2d 1023, 1048 (1980) (stating that "[t]estimony concerning intoxication should be limited to the time of the crime for which the defendant is being tried"), *modified on other grounds by State v. McDaniel*, 136 Ariz. 188, 194, 655 P.2d 70, 76 (1983).

¶106    A review of the context of that testimony, however, undermines Moody's claim.  Dr. Morenz was called on rebuttal, shortly after the jury heard evidence from the defense experts that Moody was in a psychotic, dissociated state when he committed the killings.  Dr. Morenz testified that he had eleven reasons for concluding that Moody was not insane, but rather was "malingering."  One of these reasons was that the murders did not fit the profile of "psychotic killings."  Dr. Morenz testified that psychotic killings rarely have "any rational motive."  He then told the jury that one indication that Moody was malingering was that, unlike "psychotic killers," Moody actually did have a likely motive — namely, that his substantial cocaine addiction had rendered him broke and desperate.

¶107    What evidence is permissible on rebuttal is left to the trial court's discretion.  *See State v. Young*, 116 Ariz. 385, 387, 569 P.2d 815, 817 (1977).  The rebuttal evidence

provided by Dr. Morenz in this case responded to the issues covered by the defense and is of the type on which expert testimony is generally allowed:  the mental health and thought processes of a defendant who alleges insanity or mental illness or defect.  Dr. Morenz testified to motive in support of his opinion that Moody's actions contradicted a diagnosis of psychosis.  We find no abuse of the court's discretion in permitting this testimony, and certainly no fundamental error.

   2.   Characterization of "Malingerer" as "Liar"

¶108     Moody also alleges that Dr. Morenz "exceeded the scope of permissible expert testimony by offering an opinion on [Moody's] credibility by characterizing malingering as a medical term for lying."  The defense takes Dr. Morenz's statement out of context.

¶109     On direct-examination, Dr. Morenz defined a "malingerer" as "someone who makes up their [sic] symptoms for a particular purpose."  He further stated that "[i]n Mr. Moody's case, [that purpose is] to escape criminal prosecution or gain some kind of leniency from the court."  On cross-examination, defense counsel asked Dr. Morenz whether Moody had been "called a malingerer, which is a medical term for liar."  Dr. Morenz responded, "yes."  Moody claims that by that answer, "Morenz improperly expressed his professional opinion that [Moody] is a

liar."

¶110     We find no merit in Moody's argument for two reasons. First, the question posed by defense counsel is a compound question.  For that reason, it is unclear whether Dr. Morenz was answering "yes" to the question whether Moody had been called a malingerer, or whether he was affirming that "malingerer" is a "medical term for a liar."

¶111     Second, even if we assume that Dr. Morenz intended to testify that "malingerer . . . is a medical term for liar," that definition was offered as a leading question by defense counsel on cross-examination.   This court has long held that "a defendant who invited error at trial may not then assign the same as error on appeal."   *See, e.g., State v. Endreson*, 109 Ariz. 117, 122-23, 506 P.2d 248, 253-54 (1973).  We can envision few situations in which a defendant can be said to "invite" an error more condemningly than by asking a leading question that he assigns to the witness on appeal.  For that reason, while we find no error here because of the compound nature of the question and the ambiguous response, even if Dr. Morenz's statement were erroneous, it was invited by the defense and for that reason would not provide a basis for reversal.

**I.   Failure to Preclude Dr. Sullivan from Testifying**

¶112     Moody argues that the trial court erred by failing to

preclude one of the State's mental health experts, Dr. Sullivan, from testifying because of the late disclosure of his notes and defense counsel's inability to re-interview him.

¶113    Before trial, Moody allowed Dr. Sullivan to interview him on the condition that the doctor not take notes. Immediately after concluding the interview, Dr. Sullivan dictated a report. Dr. Sullivan's report was disclosed to defense counsel two weeks before trial so that counsel could prepare to interview Dr. Sullivan. Defense counsel interviewed Dr. Sullivan once before trial and again on May 19, a week before Dr. Sullivan was scheduled to testify. At the May 19 interview, defense counsel learned that Dr. Sullivan had compiled forty pages of handwritten notes following the first interview, in preparation for trial. These notes were disclosed to the defense two days after that interview, but defense counsel did not have an opportunity to re-interview Dr. Sullivan after their disclosure and therefore moved to preclude Dr. Sullivan from testifying. Moody now claims that denial of that motion was error and warrants reversal of his convictions.

¶114    Whether to impose a sanction for late disclosure and which sanction to impose are discretionary decisions left to the trial court; we will not disturb those decisions absent an abuse of discretion. *State v. Tucker*, 157 Ariz. 433, 439, 759 P.2d

579, 585 (1988).  Preclusion is "a sanction of last resort," *State v. Talmadge*, 196 Ariz. 436, 440, 999 P.2d 192, 196 (2000), to be imposed only if "other less stringent sanctions are not applicable."  *State v. Smith*, 123 Ariz. 243, 252, 599 P.2d 199, 208 (1979).

¶115    Moody cites only one case suggesting that a failure to disclose evidence relating to a witness might require preclusion of that witness.   In *State v. Krone*, 182 Ariz. 319, 321-23, 897 P.2d 621, 623-25 (1995), we held that a trial court erroneously failed to preclude a witness's key exhibit, "the centerpiece of the star witness's testimony," which was not disclosed to the defense until the day before trial.  *Krone* turned upon a bite-mark pattern on the victim; the exhibit that the defense sought to preclude was a videotape of the bite-mark analysis.  *Id.* at 320-22, 897 P.2d at 622-24.  Our determination that the video should have been precluded was based on the importance of that evidence:  We noted that without the bite-mark evidence, "there likely would have been no jury submissible case against Krone." *Id.* at 322, 897 P.2d at 624.

¶116    Moody has not demonstrated that similar circumstances exist in this case.  Moody's brief contains no suggestion of what was in the doctor's notes, no explanation of how, if at all, the late disclosure prejudiced him, and no indication

- 62 -

whether the notes revealed information that differed from that explored during his attorney's two interviews of Dr. Sullivan. Consequently, we cannot say that the trial court abused its discretion in failing to preclude Dr. Sullivan's testimony.

**J.   Evidentiary Rulings**

¶117    Moody argues that the trial court abused its discretion in admitting three pieces of evidence:   (1) pawn slips showing that Moody sold various items between January 11, 1993 and October 16, 1993; (2) Detective Wright's personal opinion on Moody's guilt; and (3) blood, DNA, handwriting, and ballistic evidence that was never released to Moody for independent testing.

### 1.   The Pawn Slips

¶118    On May 11, 2004, the State called James Ganem, the owner of the Cash Box Jewelry and Pawn Company, to introduce two pawn slips for items pawned at his store:   a Winchester 12-guage shotgun and a Ruger .22 caliber pistol.   He verified that someone who had actual knowledge of the information recorded on the slips filled them out during the regular course of business. *See* Ariz. R. Evid. 803(6) (excluding certain business records from the hearsay rule).   They were admitted without objection. Also admitted were the accompanying police reports, which Ganem testified were required by law to be completed after each

transaction.

¶119   Next, the State introduced police reports from a different pawn shop showing that Moody pawned jewelry, a camera, and a .357 caliber revolver on January 11, July 2, and October 16, 1993.  Ganem testified that he did not own that shop, but he knew of it and recognized the reports as pawn records.  When the defense learned that the pawn slips from the second shop were to be offered, defense counsel objected and requested a mistrial on the grounds that he had no notice that the pawn slips were going to be admitted into evidence because the State had not noticed a custodian of records for the documents from the second pawn shop.  The court denied the mistrial motion and overruled the objection.  Moody contends that this was error.

¶120   On appeal, Moody claims that the police reports from the second pawn shop contained inadmissible hearsay.  We note, however, that Moody never objected to their admission on these grounds.  The sole objection made at trial was that no custodian of records had been listed and that Moody consequently had no notice that the documents would be introduced.  Defense counsel did not object on grounds of lack of foundation or hearsay.  "Absent fundamental error, if evidence is objected to on one ground in the trial court and admitted over that objection, other grounds raised for the first time on appeal are waived."

*State v. Neal*, 143 Ariz. 93, 100, 692 P.2d 272, 279 (1984). "Fundamental error is error of such dimensions that it cannot be said it is possible for a defendant to have had a fair trial." *State v. Smith*, 114 Ariz. 415, 420, 561 P.2d 739, 744 (1977).

¶121    Moody claims that the erroneous admission of this hearsay evidence denied him a fair trial because it allowed the State to establish that Moody had pawned items in the past and discredited Dr. Lewis's claim that Moody was in a state of dissociation when he pawned the guns after the murders. Even if it were error to admit these documents without a proper custodian of records, however, the admission of this evidence does not constitute "fundamental error" because the prosecution had presented other evidence that Moody had pawned items in the past. Moody's ex-girlfriend, for example, testified that Moody had pawned his guns to obtain money to buy drugs, establishing that he knew how to convert guns into cash and was not doing so for the first time in a state of dissociation after the murders. Additionally, the State rebutted Dr. Lewis's claims that Moody was in a psychotic, dissociated state by moving into evidence without objection the first two pawn slips, describing the guns that Moody stole from the Malone house. This evidence showed Moody's intent to profit by his crimes and thus undermined his claim that he was psychotic at the time of the killings. Thus

even if admission of the pawn records were error, those records were merely cumulative and did not deprive Moody of a fair trial.

**¶122** Finally, we note that even had Moody preserved this issue for appeal, reversal would not be an appropriate remedy. Reversal is not required if the error could easily be remedied on retrial. *See State v. Best*, 146 Ariz. 1, 4, 703 P.2d 548, 551 (1985) (holding that "reversal would not be appropriate if a retrial would involve admission of what is presently objected to"); *State v. Garrison*, 120 Ariz. 255, 258, 585 P.2d 563, 566 (1978) ("Were we to reverse on this ground, it would only result in a retrial at which the same evidence would be admitted . . . .  Courts should not engage in such futile practices."). Because Moody does not dispute that this evidence would have been admissible had the proper foundation been laid, on retrial the State could simply call the custodian of records and have this evidence admitted. That being said, we do not condone the State's failure to lay a proper foundation for the evidence. Nonetheless, we conclude that there was no fundamental error in denying Moody's objection to the evidence.

### 2. Detective Wright's Opinion on Moody's Guilt

**¶123** Moody claims that fundamental reversible error occurred when the State elicited testimony from Detective Wright

that she "believed Mr. Moody was responsible for these brutal murders."[10]  Moody did not object at the time of the testimony, but moved for a mistrial on this ground the next morning.  The trial court denied the motion, noting that there had been no objection at the time.  The court commented that no prejudice resulted from the statements because the defense did not deny that Moody committed the murders; the defense was that he was insane when he committed them.  The court observed that "who did the murders is not seriously at issue."  Thus, the judge implicitly concluded that Detective Wright's statement had not unfairly prejudiced Moody.  Moreover, before deliberation, the court instructed the jurors that they were not to give the testimony of police officers any greater weight than they gave to the testimony of any other witnesses and that opinions as to guilt or innocence were to be disregarded.  Moody now argues that denial of his mistrial motion was error and warrants reversal.

¶**124**     We review a trial court's failure to grant a mistrial for an abuse of discretion.  *State v. Dann*, 205 Ariz. 557, 570,

---

[10]     On cross-examination of Detective Wright, Moody's counsel attempted to show that the Detective was "out to get" Moody.  On rebuttal, the State asked why the Detective focused her investigation on Moody.  She replied, as set forth above, that she did so because she believed Moody had committed the murders.

¶ 43, 74 P.3d 231, 244 (2003).  Whether this issue was properly preserved is in question, because Moody failed to lodge a specific, contemporaneous objection and deprived the court of an opportunity to correct any error that may have occurred with an immediate curative instruction.  Ultimately, however, Moody's claim fails to withstand even an abuse of discretion analysis.

¶125    The State concedes that Detective Wright's statement was improper, citing *Fuenning v. Superior Court*, 139 Ariz. 590, 605, 680 P.2d 121, 136 (1983) (supp. op.) (stating that it is "neither necessary nor advisable to ask for a witness' opinion of whether the defendant committed the crime with which he was charged"); *cf. State v. Lindsey*, 149 Ariz. 472, 475, 720 P.2d 73, 76 (1986) (noting that we generally do "not permit expert testimony on how the jury should decide the case").

¶126    "A declaration of a mistrial, however, is 'the most dramatic remedy for trial error and should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted.'"  *Dann*, 205 Ariz. at 570, ¶ 43, 74 P.3d at 244 (quoting *State v. Adamson*, 136 Ariz. 250, 262, 665 P.2d 972, 984 (1983)).  A witness's statement of belief in a defendant's guilt does not necessarily warrant a mistrial. *State v. Herrera*, 203 Ariz. 131, 135, ¶ 7, 51 P.3d 353, 357 (App. 2002).  In *Herrera*, for example, the court of appeals held

that the trial court did not abuse its discretion in refusing to grant a mistrial after it sustained an objection to an impermissible statement regarding the defendant's guilt, struck the statement from the record, and promptly gave a curative instruction to the jury. *Id.* ¶ 3. No contemporaneous objection was made in this case, but when an objection was raised the next day, the trial court agreed to give an appropriate instruction to the jury before deliberations began. The judge ultimately did so, instructing the jury that "[t]he testimony of a police officer is not entitled to any greater or lesser weight or believability merely because of the fact he or she is a police officer" and that "[a]ny opinion expressed by any witness as to the defendant's guilt or innocence is irrelevant to your consideration and must be disregarded. The jury is the sole judge of the guilt or innocence of the defendant."

¶127 Additionally, the trial court was correct in ruling that Detective Wright's opinion that Moody killed the victims did little to prejudice Moody in proving the ultimate issue in this case: whether Moody was insane when he murdered Michelle Malone and Patricia Magda. Although Detective Wright's opinion would have been prejudicial if Moody were disputing that he killed the victims, the prejudice was reduced substantially because the defense was that Moody was insane when he committed

- 69 -

the acts.   In light of the posture of this case, we conclude that the trial court did not abuse its discretion in denying Moody's mistrial motion.

### 3.   Physical Evidence

¶128      Moody claims that the trial court erred in admitting certain physical evidence at trial.   Before trial, defense counsel requested that the State release all blood, DNA, handwriting, and ballistic evidence for independent testing. The State refused to release the evidence unless the defense stipulated that the "items are the same items that were obtained by the 'finders' listed below and examined by the 'analysts' listed below."   Moody refused to so stipulate and moved to compel the State to release the evidence.   The trial court denied the motion, ruling that the State had the right to require Moody to sign a reasonable stipulation regarding the integrity of the evidence.   On appeal, Moody claims that the court's ruling was error.

¶129      Arizona Rule of Criminal Procedure 15.1(e) provides that, upon written request, the prosecutor must "make available to the defendant for examination, testing, and reproduction" any items disclosed as evidence.   Moody further urges that the State "may not unreasonably interfere with an accused's reasonable attempts to secure, at his own expense, a blood or other

scientific test." *Smith v. Cada*, 114 Ariz. 510, 514, 562 P.2d 390, 394 (App. 1977).

¶130    Rule 15.1(e) also provides, however, that "[t]he prosecutor may impose reasonable conditions, including an appropriate stipulation concerning chain of custody, to protect physical evidence produced under this section."  While our courts have yet to address this issue, we believe that the trial court is in the best position to determine whether a stipulation is "appropriate," and we will review its decision for an abuse of discretion.

¶131    In this case, the court found the proposed stipulation appropriate.  The court noted that without it, the State might lose its ability to present the evidence at trial.  However, defense counsel continually expressed its willingness to stipulate to a chain of custody for the entire time that the evidence would be in the possession of the defense team.  It was merely unwilling to stipulate to a chain of custody for the time that the evidence was in the State's possession.  Moody alleged that his reason for so refusing was that the prosecution itself could not avow to the chain of custody regarding certain pieces of evidence, an argument he repeats on appeal.  The State did not argue this point in its response brief, which we take as a concession.

¶132    In light of the above, we have some difficulty with the trial court's conclusion that the State offered an appropriate chain of custody stipulation.  However, even if we were to find an abuse of discretion here, such an abuse would be subject to review for harmless error.  *See State v. Bible*, 175 Ariz. 549, 588, 858 P.2d 1152, 1191 (1993).  An error is harmless "if we can say, beyond a reasonable doubt, that the error did not contribute to or affect the [jury's] verdict." *Id.*

¶133    Moody's lone defense at trial was that he was insane when he committed the murders of Malone and Magda; he has never seriously contested that he killed the victims.  The evidence at issue — blood, DNA, handwriting samples, and ballistic evidence — does not bear on the critical issue in this case:  Moody's claim of insanity.  Consequently, while we do not condone unreasonable stipulations that operate to deprive defendants of their right to test evidence independently, based on the record before us we conclude that this evidence would not have affected the jury's determination regarding Moody's sanity and therefore any error was harmless.

**K.    Admission of Teibel Testimony**

¶134    Moody alleges as error the trial court's failure to preclude the testimony of David Teibel, a newspaper reporter who

interviewed Moody and wrote a story about the murders that appeared in the *Tucson Citizen* in 1994. Following a pretrial hearing to review the scope of the "reporter's privilege," the trial court ordered that questioning of Teibel be limited to matters "concerning the authenticity of statements attributable to Mr. Moody that were contained in one or more news articles authored by Mr. Teibel and published in the *Tucson Citizen*." Moody alleges that the trial court abused its discretion and denied him a fair trial by failing to preclude Teibel's testimony altogether or, in the alternative, by limiting the scope of his cross-examination of Teibel.

¶135    Whether to preclude or limit a witness's testimony lies within the discretion of the trial court. *See State v. Tucker*, 157 Ariz. 433, 439, 759 P.2d 579, 585 (1988) (noting that the sanction of preclusion of testimony for disclosure violations is reviewed for an abuse of discretion); *State v. Fleming*, 117 Ariz. 122, 125, 571 P.2d 268, 271 (1977) (holding that the trial court has the discretion to curtail the scope of cross-examination when appropriate). Consequently, we will not reverse the court's ruling on this issue absent an abuse of that discretion. *See Tucker*, 157 Ariz. at 439, 759 P.2d at 585.

¶136    Both the United States and Arizona Constitutions guarantee a criminal defendant the right to confront witnesses.

U.S. Const. amend. VI; Ariz. Const. art. 2, § 24. This right includes the right to cross-examination, *Pointer v. Texas*, 380 U.S. 400, 404 (1965), and may be violated if a defendant is "prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Olden v. Kentucky*, 488 U.S. 227, 231 (1988) (alteration in original) (citations omitted).

¶137    In Arizona, a trial judge "may place reasonable limits upon the scope of cross-examination, without infringing upon the defendant's right of confrontation." *State v. Lehr*, 201 Ariz. 509, 518, ¶ 30, 38 P.3d 1172, 1181 (2002). These limits become unconstitutional only when they deny the opportunity to present "information which bears either on the issues in the case or on the credibility of the witness." *Fleming*, 117 Ariz. at 125, 571 P.2d at 271.

¶138    In this case, the court limited cross-examination to "questions [that] probe the veracity, accuracy and authenticity of the statements made by the defendant," and expressly precluded any "questions about unpublished information, [or about] reportorial or editorial processes, practices, policies

or activities of Mr. Teibel's employment."  He had two grounds for doing so:  his belief that Teibel had a "reporter's privilege" that protected the information and his determination that the information was not relevant.

¶139    Moody claims that Teibel had no valid "reporter's privilege" and that the trial court abused its discretion in finding one.  In Arizona, a reporter has a privilege to shield a confidential source for an article.  *See* A.R.S. § 12-2237 (2003).  We agree with Moody that the reporter's privilege is not implicated in this case because Teibel's article did not involve a confidential source.  The question then becomes whether the trial court's limitation on the cross-examination of Teibel was justified on other grounds or whether it violated Moody's right to confront a witness against him.

¶140    We conclude that the trial court's limitation is sustainable on relevancy grounds and because the information allegedly sought from the witness would not have reflected on the witness's reliability or was cumulative.  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Ariz. R. Evid. 401.  Moody argues that he was unconstitutionally denied the opportunity to question Teibel on

two relevant subjects: unpublished information and the editorial process. As the State correctly observes, the record undermines Moody's claim.

¶141 Defense counsel had ample opportunity to cross-examine Teibel on the reliability of the article, despite the limitations imposed by the court. In fact, defense counsel stated at the outset of Teibel's examination that it would treat Teibel "like any other witness" and would "ask him appropriate cross-examination," leaving it to the trial court to sustain or overrule objections to his questions. Throughout cross-examination the State objected only twice and its objection was sustained only once.

¶142 By the time cross-examination had concluded, Teibel had conceded that he did not record the interview with Moody, that he had destroyed the only notes he took of the interview, that he attributed language to Moody that Moody never used, that it was possible that Moody described his actions differently from the way Teibel reported them, that Teibel paraphrased Moody's words, and that Teibel's first draft had been edited and was not published as originally written.

¶143 Ultimately, it is difficult to imagine what relevant information Teibel might have had that Moody was denied an opportunity to bring out. The examples Moody cites in his

briefs range from the completely irrelevant (for example, "who the editors were") to material that was merely cumulative. Despite Moody's claims that he was denied the opportunity to impeach Teibel, bring out his own version of the events, and question Teibel about the editorial process, the record reflects that defense counsel did all of these things. Consequently, we cannot conclude that the trial court abused its discretion by allowing Teibel to testify under an order that limited the scope of examination.

## L.   Prosecutorial Misconduct

¶144    Moody alleges five separate instances of prosecutorial misconduct that he claims warrant reversal:  (1) appealing to the jurors' emotions in closing argument; (2) improperly using non-testifying doctors' opinions; (3) using the false Carlos Logan information substantively in closing argument; (4) arguing the content of Moody's videotaped interview; and (5) improperly stating the defense's burden of proof on the insanity defense.

¶145    To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that "(1) misconduct is indeed present; and (2) a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying defendant a fair trial."  *State v. Atwood*, 171 Ariz. 576, 606, 832 P.2d 593, 623 (1992), *disapproved on other grounds*

*by State v. Nordstrom*, 200 Ariz. 229, 241, ¶ 25, 25 P.3d 717, 729 (2001). We analyze each of Moody's claims in turn.[11]

### 1. Inflammatory Appeals to Emotion

**¶146** Moody raises several claims that the prosecutor committed misconduct in appealing to the jurors' emotions in closing argument. Of these, Moody's most substantial claim is his challenge to the prosecutor's appeal to the jurors' fears that Moody would be released if found "not guilty by reason of insanity" ("NGBRI"). Additionally, Moody claims that the prosecutor improperly belittled him by referring to him as "poor Robert" and then impermissibly injected the victims' suffering into closing argument. Because only the first of these was objected to and preserved for appeal, we address each claim separately, reviewing the latter two only for fundamental error. *See State v. Thomas*, 130 Ariz. 432, 435, 636 P.2d 1214, 1217 (1981).

### a. The "Cut Loose" Comment

**¶147** Before closing arguments, defense counsel requested a

---

[11] In *State v. Hughes*, 193 Ariz. 72, 969 P.2d 1184 (1998), this court applied the "cumulative error" doctrine to a case in which an appellant raised seven separate claims of misconduct, the cumulative effect of which he alleged "denied him a fair trial." *Id.* at 78, ¶ 24, 969 P.2d at 1190. Although Moody cites *Hughes* in passing, he develops no argument on this point. It is therefore waived. *See State v. Carver*, 160 Ariz. 167, 175, 771 P.2d 1382, 1390 (1989).

jury instruction that would explain the ramifications of an NGBRI verdict. Defense counsel feared that the jurors would be reluctant to find Moody NGBRI if they thought such a verdict would put Moody "out on the street." The State argued against giving the instruction and the court denied the defense request.

¶148    The next day, knowing that no instruction would be given on the effect of an NGBRI verdict, the prosecutor argued in his rebuttal closing argument that "the defendant is asking you to excuse a man who has brutally [and] viciously . . . murdered two innocent women on the basis of a disorder that is not even settled in the mental health field . . . . Before you cut somebody loose on that kind of disorder . . . ." The court sustained an objection from defense counsel and instructed the jury to "disregard the last comments by the prosecutor." The prosecutor then clarified his remarks, stating "[b]efore you find someone not guilty, which is what I'm talking to you about, I would think that you would want some reliable evidence and there isn't any." Moody now argues that this appeal to emotion warrants reversal.

¶149    It is misconduct to appeal to the jurors' fears that an NGBRI verdict will result in a defendant's release. *State v. Makal*, 104 Ariz. 476, 478, 455 P.2d 450, 452 (1969). That is clearly what the prosecutor did by asking the jury not to "cut

- 79 -

[Moody] loose." The State relies on dicta in *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974), for the proposition that "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." We conclude, however, that the prosecutor's remarks were not ambiguous.

¶150     The phrase "cut somebody loose" requires no inferential leap to interpret. It is difficult to imagine any interpretation of the prosecutor's "cut loose" comment other than that an NGBRI verdict would result in Moody's release. Not only did this comment impermissibly appeal to the jurors' fears, but it was also an incorrect statement of law, because under Arizona law a defendant who is found NGBRI is "committed to a secure state mental health facility." A.R.S. § 13-3994 (2001). The egregiousness of the statement was magnified by the prosecutor's knowledge that the jury would not be instructed on the consequences of an NGBRI verdict.

¶151     Still, the mere fact that a prosecutor makes improper remarks does not require reversal unless, "under the circumstances of the case, [the jury] was probably influenced by those remarks." *State v. Puffer*, 110 Ariz. 180, 181, 516 P.2d

316, 317 (1973).  As in *Puffer*, Moody's counsel objected to the remark, the objection was sustained, and the jury was immediately instructed to disregard the prosecutor's comments. *See id.*  Moreover, in this case the prosecutor then made comments that sought to remedy his previous misconduct, and before the jury convened for deliberations, the trial court instructed the jury that it was not to consider the possible effects of its verdict.

¶152    In *State v. Cornell*, 179 Ariz. 314, 328, 878 P.2d 1352, 1366 (1994), this court stated that the "experienced prosecutor should have known better than to make such remarks, and his actions seem almost calculated to bring prejudicial and irrelevant matters before the jury.  His conduct jeopardized the proceedings."  We echo those concerns regarding the prosecutor's statement in this case.  However, as in *Cornell*, "[w]e do not . . . reverse convictions merely to punish a prosecutor's misdeeds []or to deter future misconduct."  *Id.*    Rather, reversal is required only when "the defendant has been denied a fair trial as a result of the actions of [the prosecutor]." *Bible*, 175 Ariz. at 600, 858 P.2d at 1203 (quoting *State v. Dumaine*, 162 Ariz. 392, 400, 783 P.2d 1184, 1192 (1989)).  The prosecutor's "cut loose" comment was irresponsible, inappropriate, and inflammatory.  However, because it was an

- 81 -

isolated comment, was promptly objected to, and was rendered less harmful by instructions by the court, we cannot conclude that the comment, by itself, denied Moody a fair trial.

### b. The "Poor Robert" Comment

¶153    Moody alleges that the prosecutor patronized and belittled him in rebuttal closing argument.  The prosecutor, in discussing the defense's claim that people did not understand dissociative identity disorder, referred to the defendant as "poor Robert Moody" for being afflicted with a disorder that no one understands.  Moody did not object to this comment.  Failure to object to a comment in closing argument waives that argument on appeal, and we therefore review it only for fundamental error.  *See Thomas*, 130 Ariz. at 435, 636 P.2d at 1217.

¶154    "Attorneys, including prosecutors in criminal cases, are given wide latitude in their closing arguments to the jury." *State v. Comer*, 165 Ariz. 413, 426, 799 P.2d 333, 346 (1990).  Although Moody cites *Comer* for the proposition that it is misconduct to belittle the defendant in closing argument, *Comer* does not stand for that proposition.  *Comer* held that a prosecutor improperly appealed to the jurors' emotions by referring to the defendant as a "monster," "filth," and the "reincarnation of the devil on earth."  *Id.*  We held that prosecutors "may comment on the vicious and inhuman nature of

the defendant's acts," but "may not make arguments which appeal to the passions and fears of the jury." *Id.* Although we agree that belittling a criminal defendant in closing argument is improper and unnecessary, given the evidence in this case we do not find that the passing comment constituted fundamental error. We therefore conclude that referring to the defendant as "poor Robert Moody" was not an error "of such dimensions that it cannot be said it is possible for a defendant to have had a fair trial." *State v. Smith*, 114 Ariz. 415, 420, 561 P.2d 739, 744 (1977).

### c. Describing the Victims' Suffering

**¶155** Moody claims that the prosecutor committed reversible misconduct by "graphically describing the suffering of each decedent" and ending his argument by telling the jury that Moody had no sympathy for the victims and asking them to have no sympathy for him. Moody failed to object to these comments, limiting our review to one for fundamental error. *See Thomas*, 130 Ariz. at 435, 636 P.2d at 1217.

**¶156** Moody mischaracterizes the prosecutor's statements. After reviewing the record, we see no "graphic description" of the victims' suffering. The prosecutor's frank description of the murders themselves is permissible. *See Comer*, 165 Ariz. at 426, 799 P.2d at 346 ("Within the latitude of closing argument

counsel may comment on the vicious and inhuman nature of the defendant's acts. In so doing, however, counsel may not make arguments which appeal to the passions and fears of the jury."). Moody has failed to show fundamental error on this point. Nor does Moody cite any cases suggesting that it was improper to ask the jury to have no sympathy for him. Indeed, we encourage jurors not to decide cases based on emotion or sympathy. We conclude that such a statement passes muster as an exhortation to the jury to do its duty. Moody therefore fails to demonstrate fundamental error requiring reversal on this issue.

### 2.   Improper Use of Non-Testifying Doctors' Opinions

¶157    Moody alleges that the prosecutor used the reports and opinions of non-testifying doctors for impermissible purposes. He claims that the prosecutor erred both by injecting these reports and opinions into his examination of witnesses and by arguing them substantively in closing argument.

¶158    On the first argument, Moody contends that the prosecutor used the reports of Drs. Potts, LaWall, Vesper, and Geffen to impeach defense experts Drs. Goldberg and Lewis. After Dr. Goldberg stated his conclusion that the results of the tests he administered to Moody were not consistent with someone who was malingering, the prosecutor asked Dr. Goldberg on cross-examination whether he had reviewed a report by Dr. Geffen that

concluded that it was "very likely" that Moody was malingering, or if he had seen Dr. Potts', Dr. LaWall's, or Dr. Morenz's reports, all of which indicated that Moody was "possibly" malingering. Dr. Goldberg said that he had not seen any of these reports. Defense counsel did not object to this line of questioning.

¶159    Two days later, defense expert Dr. Lewis testified that Moody was suffering from dissociative identity disorder ("DID"), a mental illness that she claimed had developed early in Moody's childhood and rendered him psychotic. On cross-examination, the prosecutor asked Dr. Lewis if she had reviewed the report that Dr. Potts drafted after he spent six months observing Moody. When Dr. Lewis answered "yes," the prosecutor asked her to confirm that Dr. Potts had not diagnosed Moody as having DID and that nothing in the report suggested that such a diagnosis was appropriate. There was no objection to this line of questioning.

¶160    The next day, the State called Dr. Sullivan to rebut the testimony of Drs. Goldberg and Lewis. On direct examination, the prosecutor asked Dr. Sullivan his reasons for believing that Moody was malingering. One of the reasons Dr. Sullivan gave was that Drs. LaWall, Geffen, Potts, and Morenz "all concluded that Mr. Moody was malingering." Moody neither

objected to this question nor moved to strike the answer.

¶161    Moody's final allegation of misconduct is that the prosecutor's substantive use of the doctors' opinions in closing argument was error.  In closing, the prosecutor argued that Moody had a "history of malingering."  As support, he cited Dr. Geffen's initial testing, despite the fact that Dr. Geffen had not testified at trial.  Moments later, the prosecutor stated that Drs. "LaWall, Potts, and Geffen also say [Moody is] malingering," despite the fact that neither Dr. LaWall nor Dr. Potts had testified at trial.  On rebuttal, the prosecutor argued that DID does not render one legally insane because "[e]ven Dr. Vesper says just because you have dissociative identity disorder doesn't mean you don't have control."  Dr. Vesper, an expert retained by the defense to evaluate Moody's competency to stand trial, did not testify during this trial. Finally, the prosecutor indicated that Drs. LaWall, Potts, and Geffen "didn't buy" Moody's insanity defense.

¶162    The defense did not object to any of these arguments. The defense also did not object to the use of Dr. Potts' reports or the reports of the other doctors at trial.[12]  Additionally,

_____

[12]    Moody did file a motion in limine before trial to preclude Dr. Potts as a witness on the grounds of late disclosure of the doctor's notes, but the trial judge did not find preclusion to be an appropriate sanction.   In *Hughes*, we held that "when

- 86 -

although Moody claims that he moved for a mistrial "immediately after the State's first use of a nontestifying doctor's opinion," in fact he did not so move until the next morning, and the sole basis for that motion was that those reports were tainted by the false Carlos Logan information, not that they were improper opinions of non-testifying third parties.

¶163    On appeal, Moody challenges the reports as containing improper hearsay evidence that could not be argued substantively for its truth.  Because, however, the "evidence [was] objected to on one ground [that is, late disclosure] and admitted over the objection, other grounds not specified [such as hearsay] are waived."  *State v. Zuck*, 134 Ariz. 509, 513, 658 P.2d 162, 166 (1982).  Consequently, we review this claim only for fundamental error.  *See State v. Bolton*, 182 Ariz. 290, 297, 896 P.2d 830, 837 (1995).

¶164    The prosecutor argued that the non-testifying doctors' reports could be used to impeach the defense experts.  Rule 703 of the Arizona Rules of Evidence allows an expert witness to

---

counsel [makes] the court aware of his objection through a previous motion, failure to object at trial does not then waive the issue on appeal."  193 Ariz. at 85, ¶ 58, 969 P.2d at 1198. The only ground ever offered by the defense for precluding Dr. Potts' testimony or reports, however, was late disclosure of Dr. Potts' notes to defense counsel, which defense counsel claimed impaired his opportunity and ability to interview Dr. Potts.

base an opinion on "facts or data" not admissible in evidence. The information need not be admissible if it is of the "type reasonably relied upon by experts in the particular field." *Id.* Once disclosed to the jury, this information is "not admitted as substantive evidence, but only for purposes of showing the basis of the expert's opinion." *State v. Lundstrom*, 161 Ariz. 141, 146, 776 P.2d 1067, 1072 (1989). Moody argues that the prosecutor violated *Lundstrom* by using the facts and opinions contained in the reports substantively to impeach Drs. Goldberg and Lewis, to bolster the opinion of Dr. Sullivan, and in closing argument.

### a. Use of Reports in Examination of Witnesses

¶165    Moody claims that the prosecutor's use of the reports to bolster Dr. Sullivan's testimony and to discredit that of Drs. Goldberg and Lewis violated this court's holding in *Lundstrom*, 161 Ariz. at 141, 776 P.2d at 1067. In *Lundstrom*, this court stated that while Arizona Rule of Evidence 703 allows an expert to testify to "facts or data" not admissible in evidence, "if the testifying expert merely acts as a conduit for another non-testifying expert's opinion, the 'expert opinion' is hearsay and is inadmissible." 161 Ariz. at 148, 776 P.2d at 1074. Although Moody raises a colorable claim that the prosecutor's actions here violated *Lundstrom*, he failed to lodge

a contemporaneous objection based on hearsay or confrontation grounds.[13] Consequently, his burden is to demonstrate not merely that a *Lundstrom* violation has occurred, but that this violation rendered it impossible for him to have received a fair trial. *See Bolton*, 182 Ariz. at 297, 896 P.2d at 837 (stating that matters not raised at trial are reviewed for fundamental error); *Smith*, 114 Ariz. at 420, 561 P.2d at 744 (noting that fundamental error is "error of such dimensions that it cannot be said it is possible for a defendant to have had a fair trial"). He develops no such argument and has not met the burden of demonstrating how the use of the non-testifying doctors' opinions here constitutes fundamental error.

### b.   Use of Reports in Closing Argument

¶166    Moody argues that the prosecutor improperly used the non-testifying doctors' reports as substantive evidence on four occasions during closing argument and rebuttal.  First, the prosecutor referred to Dr. Geffen's initial testing as proof of Moody's "history of malingering."  Second, he stated that Drs. "LaWall, Potts and Geffen also say he's malingering."  Third, he

---

[13]   Moody's counsel moved for a mistrial the following day on grounds of "misconduct."  He did not specifically object on grounds of hearsay or denial of Moody's right to confront witnesses.  *See supra*, ¶ 162; *see also Zuck*, 134 Ariz. at 513, 658 P.2d at 166 (failure to object on specific grounds waives error on appeal).

argued that even if the jurors agreed with Dr. Lewis's diagnosis of dissociative identity disorder, Dr. Vesper's opinion was that such a disease did not prevent an individual from controlling his or her actions. Finally, he stated that Drs. LaWall, Potts, and Geffen "didn't buy" Moody's insanity defense.

¶167 Moody claims that by arguing the substantive content of the non-testifying doctors' reports in closing argument, the prosecutor violated this court's determination in *Lundstrom* that while such reports may be used to show the bases of the expert's opinion, they may not be used as substantive evidence. 161 Ariz. at 148, 776 P.2d at 1074. We note, however, that by failing to object to any of these instances at trial, Moody deprived the court of the opportunity to cure any misuse of the reports by instructions or otherwise. *See State v. Dann*, 205 Ariz. 557, 575, ¶ 73, 74 P.3d 231, 249 (2003). Consequently, as above, Moody's burden is not merely to demonstrate error, but also to show that the error deprived him of a fair trial. *See Smith*, 114 Ariz. at 420, 561 P.2d at 744 (defining "fundamental error").

¶168 In light of this burden, we conclude that the prosecutor's injection of the non-testifying doctors' opinions into closing argument was not fundamental error. Indeed, given the other evidence presented at trial, it was merely cumulative.

Both Drs. Sullivan and Morenz testified at trial that they believed Moody to be malingering, and both set forth substantial grounds upon which they based their opinions. Because the jury already had before it ample "proper" evidence that Moody was faking or exaggerating symptoms of mental illness, the prosecutor's recitation of the non-testifying doctors' cumulative opinions in closing argument did not deny Moody a fair trial. Consequently, we conclude that if there were error here, it was not fundamental and therefore does not require reversal.

### 3. Improper Use of Moody's Videotaped Confession

¶169    Moody also challenges the prosecutor's substantive use in closing argument of Moody's videotaped confession.

¶170    During trial, defense counsel asked to play Moody's videotaped confession for the jury so the jurors could determine whether Moody was malingering. Over the State's objection, the trial court permitted the defense to play the tape, but instructed the jury to consider only Moody's demeanor and not to consider statements from the tape as substantive evidence.

¶171    After the videotape was played, the prosecutor requested that the State be permitted to ask the experts about the effect of the videotape on their opinions about Moody's malingering. The court agreed. On direct examination of Dr.

Sullivan, the prosecutor asked if, in his review of the videotape, the doctor had noticed any inconsistencies "in terms of what [Moody] remembers or what he doesn't remember." Dr. Sullivan then testified that Moody was initially told only that Patricia Magda was his next-door neighbor, but later in the interview he indicates that he is being held for murdering his next-door neighbor, despite the fact that no one had identified her as a murder victim. Four days later, the defense moved for a mistrial, arguing that Dr. Sullivan improperly considered the content of the videotape. The court denied the motion, reminding counsel that the restriction on substantive consideration applied only to the jury and that the experts could properly consider the content of the videotape.

¶172      In closing argument, the prosecutor argued that the tape showed that Moody was malingering. He stated that Moody "ke[pt] up a good story for two hours or more," but then made a significant slip. He noted that when the videotape was at 18 hours, 30 minutes, and 30 seconds, Moody told the officers that he did not know who Patricia Magda was; at 19:58:15, however, he stated that he killed his next-door neighbor. The prosecutor then said "[i]f you don't think Dr. Sullivan got it right, listen to the tape." Moody now argues that the prosecutor encouraged the jury to use the videotape for the precise purpose

that the trial court expressly forbade, namely, as substantive evidence of Moody's guilt.

¶173    Moody never objected to this argument, however, and therefore never provided the trial court the opportunity to cure any error.  *See Dann*, 205 Ariz. at 575, ¶ 73, 74 P.3d at 249.  Therefore, we review only for fundamental error.  *See id.; see also Bolton*, 182 Ariz. at 297, 896 P.2d at 837.

¶174    The prosecutor's substantive use of the tape's contents in closing appears to have been error.  The prosecutor directed the jury to consider the tape for its content, giving specific time references for statements he wished the jurors to hear.  Although the State argues that the prosecutor eventually tied the videotape to Dr. Sullivan's testimony by saying "[i]f you don't think Dr. Sullivan got it right, listen to the tape," he did so only after substantively discussing the videotape for fifteen sentences.  Such use of the videotape was specifically prohibited by the trial court.  However, a number of factors mitigate the impact of the prosecutor's conduct.

¶175    First, although the defense later objected to Dr. Sullivan's substantive reliance on the content of the video, defense counsel had originally urged that the jurors be permitted to consider the videotape evidence substantively.  Second, the prosecutor did not encourage the jurors to view the

entire tape substantively, but directed them to the particular point on the tape that would support his expert's testimony. Finally, the prosecutor obtained a waiver of the "demeanor only" ruling to allow his expert to consider the contents of the videotape and testify to it. Consequently, we conclude that the prosecutor's argument supporting Dr. Sullivan's reliance on the videotape to form his conclusion did not constitute fundamental error.

###     4.    Arguing False Carlos Logan Information

¶176     Moody challenges the prosecutor's use of the false Carlos Logan evidence for substantive purposes in closing argument.

¶177     In its closing, defense counsel argued to the jury that the opinions of Drs. Morenz and Sullivan were unreliable because they were based in part upon the Carlos Logan evidence, which was "a complete lie." Counsel implied that the information that Logan reported about Moody was fabricated and derived from newspaper articles and police reports, and suggested that Logan provided no details of the murders until he was offered a plea deal four months after his arrest.

¶178     On rebuttal, the prosecutor made three arguments designed to rebut these claims. First, he argued that Detective Wright did not discover that some of what Carlos Logan had said

was not true until September of 1995, long after the grand jury testimony and police reports had been disseminated to the doctors.   Next, he argued that some of the Carlos Logan information must be true because Logan had no way, other than a first-person report from Moody, to know that Moody "stabbed [an] old woman" or was featured on "America's Most Wanted."  Finally, the prosecutor asked the jury to consider how Moody must have met Logan — a "small-time crack seller" — when considering the defense's theory that Moody was not a cocaine addict and was not under the influence of cocaine at the time of the murders.

¶179     Moody made no contemporaneous objection to the prosecutor's comments during rebuttal argument.   Failure to object to a prosecutor's comments during closing argument limits our review to one for fundamental error only.  *See State v. Phillips*, 202 Ariz. 427, 437, ¶ 48, 46 P.3d 1048, 1058 (2002).

¶180     Counsel is given "wide latitude" in closing argument to "comment on the evidence and argue all reasonable inferences" from it.  *State v. McDaniel*, 136 Ariz. 188, 197, 665 P.2d 70, 79 (1983).   Further, "[c]omments that are invited and prompted by opposing counsel's arguments are not improper if they are reasonable and pertinent to the issues raised."   *State v. Trostle*, 191 Ariz. 4, 16, 951 P.2d 869, 881 (1997).   The prosecutor's comments fall into this category.

¶181    The State claims that telling the jury that the Carlos Logan information was given to the doctors before the State knew that it was false was intended to rebut defense counsel's claim that Carlos Logan's false statements were "fed to mental health professionals" to taint their opinions.  The State maintains that defense counsel invited this comment by putting at issue the State's motive for supplying the Carlos Logan information to the doctors.  We agree.  Defense counsel's suggestion that the State intentionally tainted its experts opened the door for the prosecution to rebut the assertion.

¶182    The State defends the prosecutor's argument that Logan must have learned certain information from Moody because Logan had no access to any other sources containing that information.  The State argues that this inference was invited by the defense's suggestion that all of Logan's evidence was false, or at least was not learned from Moody, and that none of it should have been considered by the doctors.  We agree that the prosecutor's argument responded to arguments raised by defense counsel in closing.  It was also pertinent to the case because Dr. Morenz testified that he relied at least in part on the information in making his determination that Moody was malingering, and an argument that he relied on false evidence harms his credibility.

¶183    The third comment — that Moody met with Logan, "a small-time crack seller" — supports the inference that Moody was a crack user.    Evidence that Logan had sold crack had been introduced by Moody's counsel in his cross-examination of Detective Wright.    Moody had attempted to show that Logan should not be believed because he was a criminal and a crack dealer. Thus, the evidence was before the jury and its use was not objected-to in closing.

¶184    The inference that Moody met Logan, a crack dealer, supported the prosecution's theory that Moody was a crack user. This reasonable inference was supported by other evidence in the record as well.    For example, Moody never disputed that he had a substantial crack-cocaine habit in the months before the murders.    Tucson Citizen reporter David Teibel testified that Moody told him he had spent "three to four thousand dollars" on "massive doses" of cocaine shortly before the Malone murder. Moody's ex-girlfriend also testified that, to support his substantial crack-cocaine habit, Moody had sold all of his appliances and much of his furniture and had pawned guns, jewelry, and other items to obtain money to buy crack.    Dr. Morenz testified that Moody told him that aliens forced him to use "massive quantities" of cocaine, a claim that Moody repeated to his own expert, Dr. Lewis.    Crack pipes and other

paraphernalia were found in the vehicle that Moody stole from Patricia Magda after killing her. Additionally, defense counsel had already put evidence before the jury that Carlos Logan had twelve separate drug-related arrests or convictions over the previous decade, and the jury also heard evidence that Logan told authorities he sold Moody pieces of "rock cocaine" in the day-and-a-half before his arrest. Given the volume of evidence on this point, we conclude that the prosecutor's comment, by itself, did not constitute error or deny Moody a fair trial.

### 5. Increasing the Defense Burden of Proof

¶185  As the final act of prosecutorial misconduct, Moody challenges the prosecutor's statement in closing argument that the defense had the burden of producing "evidence that makes it highly probable" that Moody was insane at the time of the murders and was "not malingering." The prosecutor reiterated this burden in rebuttal closing argument. Moody claims that this argument impermissibly increased his burden of proof and he argues that reversal is required as a result. We disagree.

¶186  A defendant is required to prove insanity "by clear and convincing evidence." A.R.S. § 13-502(B) (1989).[14] This court has held the "clear and convincing" and "highly probable"

---

[14]  This requirement is now found in section (C). The section cited in text is the version applicable to Moody's case.

standards to be interchangeable. *State v. King*, 158 Ariz. 419, 423-24, 763 P.2d 239, 243-44 (1988). Thus, Moody would have a legitimate claim here only if he could demonstrate that the burden to show that he is not faking insanity somehow differed from the burden to show that he was, in fact, insane.

¶187 We fail to see the distinction between the two. To demonstrate that one is insane, one must demonstrate that the insanity is real and not "faked" or, as used in this case, "malingered." Moody fails to explain how the prosecution misstated the applicable burden in this case and cites no authority supporting his position. Consequently, we do not find any error and decline to reverse Moody's convictions on this ground.

## M. Incorrect Jury Instruction on Intoxication

¶188 Moody alleges that the court improperly instructed the jury on the effect of intoxication. When Moody committed the murders in November of 1993, A.R.S. § 13-503 (1989) provided as follows:

> [W]hen the actual existence of the culpable mental state of intentionally or with the intent to is a necessary element to constitute any particular species or degree of offense, the jury may take into consideration the fact that the accused was intoxicated at the time in determining the culpable mental state with which he committed the act.

That statute was amended effective January 2, 1994, to eliminate

temporary intoxication as a defense "for any criminal act or requisite state of mind."  A.R.S. § 13-503 (2001); 1993 Ariz. Sess. Laws, ch. 256, §§ 2, 3.  Rather than instructing the jury that intoxication could be considered in determining Moody's mental state at the time of the acts, the trial court instructed the jury on the later version of the statute, which disallows intoxication as a defense.

¶189    Normally, we review de novo a claim that a jury instruction misstates the law.  *State v. Orendain*, 188 Ariz. 54, 56, 932 P.2d 1325, 1327 (1997).  However, Moody failed to object to the instruction and therefore did not preserve this issue for appeal.[15]  *See State v. Valles*, 162 Ariz. 1, 6, 780 P.2d 1049, 1054 (1989) ("Failure to object to a jury instruction below precludes defendant from claiming error on appeal unless the error is fundamental.").

---

[15]    Moody argues that he did object to the instruction.  A review of the record makes clear that he did not object to this instruction on the ground that it did not state the law in effect at the time Moody committed his crimes.  Instead, Moody objected to a related instruction that intoxication is not a valid defense if it aggravates a preexisting mental illness.  He objected to this latter instruction only on the ground that there was "no evidence of intoxication."  The court sustained the objection.  Moody never objected, however, to the court's § 13-503 instruction; his general objection to a related instruction is not sufficient to preserve this issue for appeal. *See State v. Long*, 119 Ariz. 327, 328, 580 P.2d 1181, 1182 (1978) (holding that raising one objection to a jury instruction does not preserve other objections on appeal).

¶190    Moody offers two separate arguments that the error in this case is fundamental and requires reversal:    (1) the instruction was erroneous because it misstated the law, and (2) the instruction violated the Ex Post Facto Clauses of the United States and Arizona Constitutions.    U.S. Const. art. I, § 9; Ariz. Const. art. 2, § 25.

¶191    We agree that the instruction given misstated the law in effect at the time Moody committed his crimes and therefore constitutes error.  *See State v. Walker*, 138 Ariz. 491, 494, 675 P.2d 1310, 1313 (1984) (finding an instruction that misstates the law is an error).  Moreover, the change in A.R.S. § 13-503 was substantive because it deprived Moody of a defense that existed at the time he committed his crimes.  Thus the Ex Post Facto Clauses of the United States and Arizona Constitutions require that the version of § 13-503 in effect at the time the crimes were committed be applied.  *See State v. Correll*, 148 Ariz. 468, 481-82, 715 P.2d 721, 734-35 (1986) (finding that a change in a capital sentencing aggravating factor was a substantive change that required application of the version in effect at the time the offense was committed).

¶192    The error in giving the incorrect jury instruction was compounded by the prosecutor, who argued the improper instruction to the jury.  He stated:  "just so we're clear,

temporary intoxication is not insanity.  That's not me saying that[;] you're going to get an instruction that says this:  the fact he's using drugs and on drugs or withdrawing from drugs is not insanity . . . .  It is not a defense and it is not insanity."

¶193    However, because Moody failed to object and our review is limited to fundamental error, we can reverse on this basis only if the error is "of such dimensions" that it deprived him of a fair trial.  *See Smith*, 114 Ariz. at 420, 561 P.2d at 744. Because of the defenses asserted and the facts placed before the jury in this case, we do not find the error fundamental.

¶194    Throughout trial, the defense strategy was to distance Moody from drug use and show that the murders were the result of psychosis, not cocaine addiction or intoxication by drug use. Indeed, arguing against a State-proposed instruction on intoxication, defense counsel urged that the court could not give it because it was unsupported.  He denied that there was any "evidence of intoxication during the event."  He noted that the only evidence that Moody was using drugs was Dora King's statement that Moody had smoked crack approximately seven days before the first murder.  Thus, defense counsel argued, the jury was provided "no evidence [Moody] was intoxicated" at the time of the killings.  While the State attempted to argue that

evidence presented of Moody's past drug use suggested that the motive for committing the crimes was to get money to buy more cocaine, defense counsel argued that an instruction on intoxication would be "inviting the jury to speculate where there is no evidence." Although there was substantial evidence of extensive drug use in the weeks before the murders, *see supra* ¶¶ 183-84, there was no evidence of intoxication at the time of the offense.

¶195    In urging that reversal is required here, Moody relies on *State v. Hudson*, 85 Ariz. 77, 331 P.2d 1092 (1958), in which we reversed the defendant's murder conviction and remanded for a new trial because the trial court failed to give an instruction on voluntary intoxication. The defendant in that case, however, expressly defended on the grounds that he lacked the requisite mental state because he was intoxicated, and, unlike Moody's case, in *Hudson* there was some evidence of intoxication at the time of the murders, as well as intoxication in the days preceding them. *Id.* The evidence indicated that the defendant had "helped consume a total of two and three-fourths gallons or eleven quarts of wine on the day of the killing and the day preceding it." *Id.* at 81, 331 P.2d at 1095. In light of this evidence, we held that the trial court's failure to properly instruct the jury on the effect of intoxication deprived the

- 103 -

defendant of an "important right, which the law accorded him, to have the jury pass on the truthfulness of his story, and, if they believed that he was intoxicated to any extent to say whether such intoxication prevented him from entertaining the malice necessary to constitute murder in the second degree." *Id.*

¶196    In Moody's case, the defense attempted to *defeat* any evidence of drug use and consistently argued that there was no evidence that Moody used drugs near the time of the murders. Moody presented evidence throughout trial demonstrating that these crimes were caused by psychosis and not by cocaine.  Nor did the State present any evidence that Moody was intoxicated at the time of the murders.  As a result, instructing the jury regarding the effect of intoxication at the time of the murders did not negate a culpable mental state and did not render Moody's trial fundamentally unfair.  Consequently, relief is denied on this ground.

**N.    Failure to Give a Voluntary Act Instruction**

¶197    Moody alleges error in the trial court's refusal to give a voluntary act instruction.  The proposed instruction directly tracked the language of A.R.S. § 13-201 (2001) that "[t]he minimum requirement for criminal liability is the performance by a person of conduct which includes a voluntary

act or the omission to perform a duty imposed by law which the person is physically capable of performing." We review a trial court's refusal to give a jury instruction for an abuse of discretion. *State v. Bolton*, 182 Ariz. 290, 309, 896 P.2d 830, 849 (1995). A defendant is entitled to a jury instruction on any theory reasonably supported by the evidence. *State v. Melendez*, 121 Ariz. 1, 5, 588 P.2d 294, 298 (1978).

¶198    Moody argues that his defense at trial was that he was not in control of his actions, and that this argument was supported by the testimony of Drs. Lewis, Morenz, and Sullivan, all of whom testified that Moody reported not being in control of his actions. Moody misconstrues the voluntary act necessary to support the imposition of criminal responsibility. As a result, the trial court correctly determined that a voluntary act instruction was not reasonably supported by the evidence.

¶199    In *State v. Lara*, 183 Ariz. 233, 234, 902 P.2d 1337, 1338 (1995), this court clarified that the "voluntary act" requirement of A.R.S. § 13-201 merely codified the common-law actus reus requirement. In *Lara*, the defendant asserted that he had not acted voluntarily because he suffered from an organic brain impairment and personality disorder. *Id.* We held, however, that "the term 'voluntary act' [means] a determined conscious bodily movement, in contrast to a knee-jerk reflex

driven by the autonomic nervous system." *Id.* at 234-35, 902 P.2d at 1338-39. We noted "bodily movement[s] while unconscious, asleep, under hypnosis, or during an epileptic fit" as examples of involuntary acts. *Id.* at 234, 902 P.2d at 1338. Thus, despite Lara's brain damage and personality disorders, the court found no evidence that his act was involuntary: "Lara's expert testimony falls far short of this. [Lara] was not unconscious. [He] was relentless in his effort and determination. He was thus not entitled to a voluntary act instruction under A.R.S. § 13-201." *Id.*

¶200 The same reasoning applies in this case. Moody's alleged dissociative identity disorder, narcissistic personality disorder, and other brain impairments may bear upon the mens rea determination, but do not inform the actus reus determination. *See* A.R.S. § 13-502(A). As in *Lara*, no expert testimony here suggested that Moody's actions were not performed consciously and as a result of effort and determination. Of the many doctors who testified at the various stages of this trial, only Dr. Lewis opined that Moody "was clearly in a dissociated state" at the time of the murders, and that it "is not uncommon in people who dissociate [to] *feel* as though they're being controlled by something else." (Emphasis added.) Even if the jury accepted this testimony, Moody's self-reported feeling of

not being in control falls short of demonstrating that his actions were not voluntary. No mental health expert suggested that Moody was *actually* being controlled by something or someone else, which is what *Lara* requires to demonstrate the lack of a voluntary act. 183 Ariz. at 235, 902 P.2d at 1339 (requiring "a knee-jerk reflex driven by the autonomic nervous system").

¶201    No evidence in this case reasonably supported a finding of a lack of a voluntary act. Consequently, Moody was not entitled to a voluntary act instruction and the trial court did not abuse its discretion in refusing to give one.

**O.    Refusal to Permit Surrebuttal Argument**

¶202    Moody contends that because he bore the burden of proof on the insanity defense, the trial court should have allowed him to make a surrebuttal argument and its refusal to do so constituted "constitutional and prejudicial error." Preliminarily, we note that the record is not clear whether defense counsel ever requested surrebuttal argument: The record is devoid of any evidence that Moody requested surrebuttal argument either during discussions about closing argument and jury instructions or after the prosecution's rebuttal argument.[16]

---

[16]    The only record cite Moody provides is the following comment by defense counsel during voir dire that prospective jurors should be warned that the trial might last a long time:

Consequently, the argument appears to have been waived.

**¶203** Even had Moody preserved this issue for appeal, however, whether to permit surrebuttal argument is a decision committed to the discretion of the trial court. *See State v. Jensen*, 153 Ariz. 171, 180, 735 P.2d 781, 790 (1987) (upholding the trial court's denial of surrebuttal testimony). On appeal, we will not disturb the court's rulings absent an abuse of that discretion. *Id.* The only authority Moody cites suggesting that the court abused its discretion is the dissenting opinion in *State v. Zimmerman*, 166 Ariz. 325, 331, 802 P.2d 1024, 1030 (App. 1990) (Kleinschmidt, J., dissenting), which suggests that because the defendant bears the burden of proving an insanity defense, it *should* be an abuse of discretion to not allow surrebuttal.

**¶204** We decline to hold that the failure to permit surrebuttal when there has been no request for it constitutes an

---

I do not know how many rebuttal witnesses, and the Court has not yet made any indication whether or not you're going to allow a surrebuttal, since we do have the burden of proof on that issue and certainly also if we're going to have surrebuttal argument on the issue of insanity, that will impact on it.

Moody cites this statement for the proposition that "Counsel requested surrebuttal on insanity but was denied." Because we could find no evidence of a request for surrebuttal or denial of such a request anywhere in the record, we conclude that any such request was waived.

abuse of discretion. We opt not to create a per se rule requiring surrebuttal argument in all cases in which insanity is raised as a defense, and reaffirm our previous holdings granting discretion to the trial judge to determine whether to permit surrebuttal in a given case. *See, e.g., State v. Steelman*, 120 Ariz. 301, 319, 585 P.2d 1213, 1231 (1978).

## P.   Failure to Instruct on Effect of NGBRI Verdict

¶205     Finally, Moody argues that the trial court erred by refusing to give an instruction that would explain to the jury that a "not guilty by reason of insanity" ("NGBRI") verdict would not result in Moody's release. Defense counsel twice requested such an instruction, once while settling jury instructions and once following the State's rebuttal argument, in which the prosecutor urged the jury not to "cut [Moody] loose." Both times the court refused to give it, indicating that before the jurors began deliberating it would give a general instruction that the jury should not consider the punishment or consequences to which Moody might be subject if convicted. Moody contends that the failure to instruct the jury on the actual effect of an NGBRI verdict violated his rights to due process and a fair trial.

¶206     The failure to instruct the jury on the consequences of an NGBRI verdict is not, by itself, error. *State v. Doss*,

116 Ariz. 156, 161, 568 P.2d 1054, 1059 (1977) (citing *State v. Jensen*, 111 Ariz. 408, 531 P.2d 531 (1975), and *State v. Peats*, 106 Ariz. 254, 475 P.2d 238 (1970)). Rather, "[t]he decision to refuse a jury instruction is within the trial court's discretion, and this court will not reverse it absent a clear abuse of that discretion." *Bolton*, 182 Ariz. at 309, 896 P.2d at 849.

¶207 We agree with Moody that an instruction regarding the effect of an NGBRI verdict might have helped mitigate the effect of the prosecutor's statement in closing argument. *See supra* ¶¶ 146-52. This court has previously held, however, that such an instruction is not required and we noted that the jury's understanding of the ramifications of "guilty" and "not guilty" verdicts is incomplete because "a jury can never know whether a sentencing judge will give the maximum sentence possible or a lesser one, or whether he will suspend imposition of sentence and grant probation." *Jensen*, 111 Ariz. at 410, 531 P.2d at 533. We therefore concluded in *Jensen* that the jurors "had an obligation of finding the defendant guilty, not guilty or not guilty by reason of insanity . . . . What happened after their verdict was not their concern." *Id.* Because there was ample precedent in our case law for the trial court's decision not to give the NGBRI instruction, we find no abuse of discretion in

failing to give the instruction generally.

¶208    Moody also alleges that the failure to give the instruction immediately after the prosecutor exhorted the jury not to "cut [Moody] loose" constituted error. The trial court sustained a defense objection to the statement and instructed the jury to disregard it. Before deliberations, the court instructed the jury not to consider or discuss "the possible punishment or consequences" that would flow from a verdict of guilt. We presume that jurors follow the court's instructions. *State v. Ramirez*, 178 Ariz. 116, 127, 871 P.2d 237, 248 (1994). Consequently, we find no reversible error in the failure to give an NGBRI instruction.

### IV.  SENTENCING ISSUES

¶209    Moody was sentenced to death under a procedure found unconstitutional in *Ring v. Arizona*, 536 U.S. 584 (2002) ("*Ring II*"). In *Ring II*, the United States Supreme Court held that Arizona's former capital sentencing scheme violated the defendant's Sixth Amendment right to a jury trial. *Id.* at 609.[17] In doing so, the Court held that defendants "are entitled to a jury determination of any fact on which the legislature

---

[17]    The legislature has amended the capital sentencing statute so that sentencing factors in capital cases are now tried before juries. *See* 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 1.

conditions an increase in their maximum punishment." *Id.* at 589. The Court remanded the case for further proceedings consistent with its decision. *Id.* at 609.

¶**210** Moody's case was one of several death penalty cases we consolidated on remand to determine whether *Ring II* required reversal or vacatur of the death sentences. *State v. Ring*, 204 Ariz. 534, 544, ¶¶ 5-6, 65 P.3d 915, 925 (2003) ("*Ring III*"). We review the sentence imposed under Arizona's superseded capital sentencing statute for harmless error. *Id.* at 555, ¶ 53, 65 P.3d at 936.

¶**211** An aggravation/mitigation hearing in Moody's case was conducted over the course of three days in December 2001 and January 2002. In the special verdict, the court found the following aggravating factors with respect to both murders: (1) Moody had been convicted of a separate offense for which life imprisonment was imposable, A.R.S. § 13-703(F)(1) (1993); (2) he committed the murders in the expectation of pecuniary gain, *id.* § 13-703(F)(5); and (3) he committed the murders in an especially cruel, heinous or depraved manner, *id.* § 13-703(F)(6).

¶**212** Moody alleged eleven mitigating circumstances. Of these, the trial court found four: (1) lack of a criminal record, (2) good character in his professional life, (3)

- 112 -

military service, and (4) nonviolent character and lack of prior violent history. Weighing the four proven mitigating circumstances against the three aggravating circumstances, the court found the mitigators "insufficient to call for leniency." The court imposed sentences of death for the murders of Michelle Malone and Patricia Magda.

¶213 In *Ring III*, we concluded that judicial fact-finding in the capital sentencing process may constitute harmless error if we can conclude beyond a reasonable doubt that no reasonable jury would fail to find the aggravating circumstance. 204 Ariz. at 555, 565, ¶¶ 53, 102-04, 65 P.3d at 936, 946. We now examine whether the *Ring II* error was harmless with respect to the sentences imposed by the trial judge in Moody's case.

## A. Aggravating Circumstances

### 1. Prior Convictions

¶214 Arizona Revised Statutes § 13-703(F)(1) lists as an aggravating circumstance that the "defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable." In this case, the trial court found that the jury's verdict of guilt as to Michelle Malone's murder satisfied this aggravating factor for the Patricia Magda conviction, and that the jury's verdict of guilt as to the Magda murder satisfied the factor for

the Malone conviction. Moody argues that because the convictions occurred at the same time, neither of these convictions can serve as an historical prior *conviction* for the other.

¶215     This court has held that the order of the crimes or convictions themselves is not important. *See State v. Lee*, 189 Ariz. 590, 604, 944 P.2d 1204, 1218 (1997). The relevant inquiry is whether the convictions were entered before the sentencing hearing. *Id.* Moody's convictions were entered before his sentencing hearing. Consequently, there was no error in allowing each murder to be used as a prior serious offense with respect to the other murder.

¶216     We have also affirmed the legal conclusion that a murder conviction is one "for which under Arizona law a sentence of life imprisonment or death was imposable" without remanding for a jury finding. *State v. Nordstrom*, 206 Ariz. 242, 245, ¶ 7, 77 P.3d 40, 43 (2003). Moody concedes that this court has held that the (F)(1) factor falls outside the *Ring* mandate and does not require a jury finding. *See Ring III*, 204 Ariz. at 556, ¶ 55, 65 P.3d at 937; *see also State v. Lehr*, 205 Ariz. 107, 109, ¶ 6, 67 P.3d 703, 705 (2003). We decline to reexamine the issue. Moody raises no other basis upon which we might disturb the trial court's finding that the (F)(1) aggravating

factor was proven beyond a reasonable doubt as to both murders. We therefore affirm this ruling.

### 2. Pecuniary Gain

¶217    It is a statutory aggravating factor in Arizona that the defendant "committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value." A.R.S. § 13-703(F)(5). This factor is satisfied only "if the expectation of pecuniary gain is a motive, cause, or impetus for the murder and not merely a result of the murder." *State v. Hyde*, 186 Ariz. 252, 280, 921 P.2d 655, 683 (1996). It is not enough merely to show that a defendant took property or money after a murder occurred. *State v. Wallace*, 151 Ariz. 362, 368, 728 P.2d 232, 238 (1986) (citing *State v. Gillies*, 135 Ariz. 500, 512, 662 P.2d 1007, 1019 (1983)); *see also State v. Armstrong*, No. CR-00-0595-AP, 2004 WL 1576636, at *2 n.2, ¶ 7 (Ariz. July 15, 2004) (confirming this court's application of the *Hyde* and *Wallace* standards). The (F)(5) inquiry is "highly fact-intensive" and requires the state to "establish the connection between the murder and motive through direct or strong circumstantial evidence." *Ring III*, 204 Ariz. at 560, ¶ 76, 65 P.3d at 941 (citing *State v. Cañez*, 202 Ariz. 133, 159, ¶ 94, 42 P.3d 564, 590 (2002)).

¶218    In this case, the trial court found the pecuniary gain

factor based on three considerations:  at the time of the murders, Moody was suffering "severe financial difficulty"; Moody entered the Malone and Magda homes "for the purpose of obtaining property of value"; and the property obtained from those homes was used "shortly after each of the murders . . . to obtain cash."

¶219    In response, Moody notes that these are all questions of fact that a jury could resolve differently than did the trial judge.  The defense team presented evidence at trial that Moody was suffering from brain dysfunction, psychosis, and dissociative identity disorder, and that he was in a "dissociative state" at the time of the murders.  Additionally, there was substantial evidence at trial that Moody had used "massive amounts" of cocaine at some time before the murders and that heavy cocaine use can lead to violent behavior.  Finally, there was evidence that a small television, a microwave, jewelry, and cocaine were left behind at one of the murder scenes.

¶220    We will not deem harmless the finding of an (F)(5) aggravating factor if circumstantial evidence and witness credibility could be weighed differently by a reasonable jury than they were by the sentencing judge.  *State v. Hoskins*, 204 Ariz. 572, 574, ¶ 6, 65 P.3d 953, 955 (2003); *see also State v.*

*Rutledge*, 206 Ariz. 172, 175, ¶ 14, 76 P.3d 443, 446 (2003). That Moody had a pecuniary motive to murder Malone and Magda is a plausible inference that may be drawn from the circumstantial evidence, but it is not the only reasonable inference that may be drawn. Because a reasonable jury could differently assess the evidence upon which the trial judge based his pecuniary gain finding, we cannot conclude that the trial court's finding of the (F)(5) factor was harmless.

    3.   <u>Especially Heinous, Cruel, or Depraved</u>

**¶221** A murder may also be aggravated if a defendant "committed the offense in an especially heinous, cruel or depraved manner." A.R.S. § 13-703(F)(6). To establish this factor, the state must prove at least one of these three components beyond a reasonable doubt. *State v. Cropper*, 206 Ariz. 153, 156, ¶ 11, 76 P.3d 424, 427 (2003). The trial judge found that both murders were especially cruel and that both demonstrated "especial heinousness or depravity."

    *a.   Especially Cruel*

**¶222** The trial judge first found that Moody committed both murders in an especially cruel manner. In *State v. Knapp*, we defined "cruel" as "disposed to inflict pain esp. in a wanton, insensate or vindictive manner: sadistic." 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977) (quoting Webster's Third New

International Dictionary).  Physical cruelty exists if "the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur."  *State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997) (citations omitted).

¶223     As to the Malone murder, the trial judge found evidence of a defensive wound to her hand, a broken fingernail, a lost contact lens, blood throughout the house, and Moody's admissions to "establish that there was a violent struggle before Mr. Moody subdued Ms. Malone by tying her into a chair." The trial judge also considered the fact that Malone knew Moody and he knew she could identify him if she survived, that the evidence suggested she suffered multiple injuries inflicted before her death, and that she raised her hand in a defensive gesture to defend against the first bullet.  The court concluded that "Michelle Malone was clearly conscious until at least that point," and that "[t]he murder of Michelle Malone was especially cruel, because she consciously suffered physical pain and mental anguish for a fairly prolonged period of time, and clearly the Defendant knew of her suffering."

¶224     As evidence that Magda suffered pain, the trial judge found that Moody tied her up with neckties and cords tightly enough to leave marks on her arms and wrists.  Further, because

Moody went to the bank twice and communicated with Magda both times after returning, the trial court concluded that Magda must have been conscious and suffering for some period of time. Ultimately, the court concluded that "[t]he prolonged ordeal . . . surely caused her anguish:  physical anguish due to the restraints and her immobility and mental anguish due to the uncertainty of her fate and the knowledge that the defendant was aware she could identify him as her attacker if she survived."[18]

¶225     Based on these facts, we conclude that no reasonable jury could find that Malone did not "experience[] physical or mental pain prior to death."  *See Trostle*, 191 Ariz. at 18, 951 P.2d at 883.  The same could be said for Magda.

¶226     However, *Trostle* contains an additional requirement: that "the defendant knew or should have known that suffering would occur."  *Id.*  Because evidence was presented that Moody was in a "dissociated state" due to psychosis, drug impairment, or both, we cannot conclude beyond a reasonable doubt that a reasonable jury could not find other than the trial court did on this issue.  Consequently, we cannot affirm the trial court's

---

[18]   Because the timing was uncertain regarding the many puncture wounds on Magda's body, the court could not say beyond a reasonable doubt that she was conscious during the infliction of the wounds and did not consider them in the (F)(6) examination.

- 119 -

finding of special cruelty as to either count.

### b. Especially Heinous and Depraved

¶227    The trial judge also found that both murders were especially heinous and depraved.  Our case law sets forth five factors that should be considered in determining heinousness and depravity:  (1) whether the defendant relished the murder, (2) whether he inflicted gratuitous violence, (3) whether he needlessly mutilated the bodies, (4) whether the crimes were senseless, and (5) whether the victims were helpless.  *State v. Gretzler*, 135 Ariz. 42, 52, 659 P.2d 1, 11 (1983).

¶228    In this case, the trial court based its findings of heinousness and depravity on the use of gratuitous violence, the senselessness of the murders, and the helplessness of the victims.  The court found that both murders involved more violence than was necessary to cause death:  four gunshot wounds and multiple injuries to Malone's body, and twenty-four blunt force injuries and nine to fourteen sharp force injuries to Magda's body.  The trial judge found both murders senseless because it was not necessary to kill the victims to accomplish the theft of their property, and he found the victims helpless because they were bound and restrained.

¶229    Regarding the gratuitous violence finding, in this case no expert was able to pinpoint exactly which injuries

caused the death of each victim, and the State never attempted to establish that Moody knew which shots or blows caused each death. Consequently, we conclude that a reasonable jury might arrive at a different conclusion than the trial judge did on whether the State established that Moody inflicted gratuitous violence.

¶230    Even if we could conclude that no reasonable jury could fail to find the senselessness and helplessness factors, without the gratuitous violence factor the other factors are substantially less weighty:  "Senselessness and helplessness are less probative of the defendant's state of mind than are relishing, gratuitous violence, and mutilation."  *Hyde*, 186 Ariz. at 281, 921 P.2d at 684. "Therefore, senselessness and helplessness, without the presence of other factors, are usually insufficient to establish depravity beyond a reasonable doubt." *State v. Prince*, 206 Ariz. 24, 27, ¶ 10, 75 P.3d 114, 117 (2003).

¶231    As was true regarding the intentionally cruel component, we cannot affirm an (F)(6) finding based on findings of intentionally heinous or depraved acts unless we can conclude that no reasonable jury could arrive at a different conclusion than the trial judge did. *See, e.g., id.* at 28, ¶ 12, 75 P.3d at 118.  Ultimately, the cruel, heinous, and depraved aggravator

- 121 -

depends on the defendant's state of mind and the assessment of sometimes conflicting facts. *See, e.g., id.* at 27, ¶ 9, 75 P.3d at 117; *Cropper*, 206 Ariz. at 156, ¶ 11, 76 P.3d at 427 (analyzing cruelty factor). Because Moody's mental state was hotly contested throughout trial and sentencing, we cannot conclude beyond a reasonable doubt that no jury would accept the defense's argument that Moody lacked the requisite state of mind to satisfy this aggravator.

## B. Mitigating Factors

¶232 Our harmless error inquiry does not end with an examination of the aggravating circumstances. Because we can affirm a capital sentence only if we can conclude beyond a reasonable doubt "that no rational trier of fact would determine that the mitigating circumstances were sufficiently substantial to call for leniency," we must also consider whether reversible error occurred with respect to the mitigating circumstances. *Ring III*, 204 Ariz. at 565, ¶ 104, 65 P.3d at 946.

¶233 At his sentencing hearing, Moody offered eleven mitigating circumstances for the court's consideration. One of these was statutory — that his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." A.R.S. §

13-703(G)(1). The remainder were non-statutory: his lack of any prior criminal history, good character for parenting, good character in his professional life, military service, psychosocial stressors, cocaine use and addiction, nonviolent character and lack of prior violent history, correlation between physical abuse as a child and subsequent substance abuse as an adult, the inability to appreciate the nature and consequences of his actions, and a nonviolent, law-abiding character.

¶234 The trial judge found four of the mitigating factors: lack of criminal record, good character in his professional life, military service, and lack of prior violent history. He gave little weight to them, however, and concluded that they were insufficient to call for leniency.

¶235 Based on the conflicting evidence in this record on these issues, we cannot conclude beyond a reasonable doubt that no rational jury would find other than as the trial judge found. A reasonable jury might have found additional mitigating factors or weighed differently the mitigating factors that were found. We also cannot say beyond a reasonable doubt that if a jury had found additional mitigating circumstances or weighed the mitigating circumstances differently, it would not have found them "sufficiently substantial to call for leniency." A.R.S. § 13-703(E). Therefore, we conclude that the *Ring II* error was

- 123 -

not harmless in this case.

## V. CONCLUSION

**¶236** For the foregoing reasons, we affirm Moody's convictions for the first degree murders of Michelle Malone and Patricia Magda. However, because we cannot find harmless error in his sentencing procedure, we vacate Moody's death sentence and remand this case for jury resentencing pursuant to A.R.S. §§ 13-703 and -703.01.

_____
Rebecca White Berch, Justice


CONCURRING:


_____
Ruth V. McGregor, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
Sheldon H. Weisberg, Judge*


*The Honorable Andrew D. Hurwitz recused himself. Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Sheldon H. Weisberg, Chief Judge of the Arizona Court of Appeals, Division One, was designated to sit in Justice Hurwitz's place.

**J O N E S, Chief Justice, concurring in part, dissenting in part:**

¶237    I concur in the judgment of the court both as to Moody's convictions and the remand for resentencing.  I dissent, however, from the majority's conclusion that harmless error analysis is appropriate where sentencing determinations, including factual findings on aggravating circumstances, are made by the trial judge in the absence of the jury.  I would remand the case for resentencing solely on the basis of the Sixth Amendment violation of the right to trial by jury on statutory aggravating factors relative to the death penalty.  *See State v. Armstrong*, _____ Ariz. ____, ¶¶ 25-37, ___ P.3d ___ (2004) (supplemental opinion) (Jones, C.J., concurring in part and dissenting in part); *see also State v. Sansing*, 206 Ariz. 232, 241-42, ¶¶ 40-46, 77 P.3d 30, 39-40 (2003) (Jones, C.J., dissenting).

_____
Charles E. Jones, Chief Justice